[No. C061031. Third Dist. Apr. 6, 2010.]

STEVEN C. MARTINEZ, Plaintiff and Respondent, v.
BOARD OF PAROLE HEARINGS, Defendant and Appellant.

580

Counsel

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien and Krista L. Pollard, Deputy Attorneys General, for Defendant and Appellant.

Law Office of Ken I. Karan and Ken I. Karan for Plaintiff and Respondent.

Opinion

**SCOTLAND, P. J.**—While serving the third year of a sentence of 157 years to life for kidnapping a woman and committing violent crimes against her, including rape and other forcible sex acts, Steven C. Martinez was stabbed by another prison inmate. The stabbing lacerated Martinez's spinal cord, causing "immediate and complete quadriplegia." Due to his physical condition, Martinez later asked the Board of Parole Hearings (BPH) to recommend that his sentence be recalled and that he be granted a compassionate release from custody pursuant to Penal Code section 1170, subdivision (e). (Further section references are to the Penal Code unless otherwise specified.)

Section 1170 provides that BPH "may recommend" to the sentencing court that a defendant's sentence be recalled (§ 1170, subd. (e)(1)) and the defendant be released from custody (§ 1170, subd. (e)(9)) if, after judgment was originally imposed, the defendant has become terminally ill with an incurable condition that would produce death in six months, or has become permanently medically incapacitated with a medical condition rendering the defendant unable to perform activities of basic daily living and requiring 24-hour total care, and the condition is such that the defendant would not pose a threat to public safety if released from custody. (§ 1170, subd. (e)(2)(A), (B), (C).)

BPH denied Martinez's request, but the superior court issued a writ of mandate directing BPH to recommend to the sentencing court that Martinez's sentence be recalled. The superior court cited three reasons for its ruling: (1) BPH failed to make explicit findings as to whether Martinez meets the criteria in section 1170, subdivision (e)(2) for recall of sentence; (2) BPH considered "factors and criteria outside the scope of its authority," i.e., that Martinez's period of confinement should be proportionate to the seriousness of his crimes and that, because of the nature of his crimes and his continually abusive behavior in prison, an early release would not be in the interest of justice; and (3) BPH's denial of the request "lacks an evidentiary basis" because the evidence can be viewed "in only one way," namely, that Martinez is eligible for recall of sentence and release from custody.

BPH appeals, asserting that section 1170 gives it "discretion" whether to recommend recall of sentence when, "in [BPH's] judgment," a prisoner's condition satisfies the statutory criteria for recall of sentence and release. Conceding that it did not explicitly make findings as required by the statute, BPH "has not appealed the superior court's judgment to the extent that it require[s] the Board to make findings." And BPH does not challenge the superior court's ruling that, in determining whether to recommend the recall of sentence, BPH is limited to the specific criteria set forth in section 1170, subdivision (e). Instead, BPH claims some evidence supports its implied finding that, despite his physical condition, Martinez would be a threat to public safety if released from prison. Thus, BPH argues, the superior court erred in directing it to recommend the recall of Martinez's sentence and his release from custody pursuant to section 1170, subdivision (e)(2) and (9).

We shall affirm the superior court's order to the extent that it (1) faults BPH for failing to make explicit findings required by subdivision (e)(6) of section 1170, and (2) concludes that BPH may not exercise its discretion based on factors and criteria not set forth in the statute.

We shall reverse the order to the extent that it directs BPH to recommend recall of Martinez's sentence and his release from custody.

As we will explain, the word "may" in the phrase "the board may recommend to the court that the prisoner's sentence be recalled [if the prisoner meets the criteria set forth in subdivision (e) of section 1170]" must be interpreted in a way that effectuates the provision's primary purpose of saving the state money by authorizing the release from prison custody of those inmates who are terminally ill or permanently medically incapacitated and do not pose a threat to public safety. In this light, the superior court correctly held that the word "may" has to be read to mean BPH is authorized to recommend the recall of sentence and release of such an inmate, and *must so recommend* if the prisoner meets the statutory criteria.

However, the superior court incorrectly concluded that, on the facts presented, BPH erred in failing to find that Martinez would not pose a threat to public safety if released from custody. The proper standard of judicial review is whether "some evidence" supports the conclusion of BPH that a prisoner does not come within the statutory requirement for recall of sentence and release from custody. (See *In re Lawrence* (2008) 44 Cal.4th 1181, 1191 [82 Cal.Rptr.3d 169, 190 P.3d 535] (hereafter *Lawrence*).) This "highly deferential" standard of review does not allow a court to second-guess BPH's factual finding. (*Id.* at p. 1204.) Our role is narrow. A court has the authority to do no more than "ensure that [BPH's] decision reflects 'an individualized consideration of the specified criteria' and is not 'arbitrary and capricious' "

(*id.* at p. 1205), i.e., that BPH's decision is supported by " 'some evidence' " viewed in the light most favorable to the decision (see *id.* at p. 1204). For reasons that follow, we cannot say that BPH acted arbitrarily and capriciously in refusing to recommend the recall of Martinez's sentence and his release from custody. By refusing to do so, BPH impliedly concluded the evidence did not support a finding that Martinez would not pose a threat to public safety if released from custody. Stated another way, BPH impliedly found that Martinez could pose a threat to public safety if released. Applying the deferential standard of review, as we must, we conclude there is some evidence to support an implied finding that, despite his quadriplegia, Martinez could be a threat to public safety if released because he is an evil, angry, and violent person who may seek the aid of others to harm those who irritate him.

Nonetheless, we must direct BPH to reconsider the matter because it did not explicitly make factual findings required by section 1170, subdivision (e)(6), and it wrongly considered factors other than the criteria set forth in the statute.

## FACTS AND PROCEDURAL BACKGROUND

In March 1998, Martinez drove his car into two young women, pinning one beneath the vehicle. After grabbing the incapacitated woman by the throat and punching her in the face, breaking her nose, Martinez placed her in the backseat of the car and drove to a secluded location, where he forcibly committed various sexual acts upon the battered and bloodied woman. Convicted of forcible rape, forcible oral copulation, rape with a foreign object, assault with a deadly weapon, battery causing serious injury, hit and run causing injury, and kidnapping, he was sentenced to 165 years to life in state prison. The sentence was later reduced to 157 years to life.

In February 2001, while serving his sentence at Centinela State Prison, Martinez was attacked by two inmates and was stabbed in the neck. The knife wound lacerated Martinez's spinal cord, causing instant quadriplegia. He "has no motor power whatsoever in his arms or legs," "is only able to move his head to a very minimal degree," and does not have any control over his bowel or bladder movements. He will require "24-hour a day complete care for the rest of his life and has no chance of regaining any motor skills."

On February 11, 2008, Martinez's attorney, Ken I. Karan, sent a letter to the warden and the chief medical officer of Corcoran State Prison, asking them to consider Martinez for recall of his sentence and release pursuant to section 1170, subdivision (e). After describing the deteriorating nature of Martinez's condition, Karan explained: "The heavy burden on the state to care for [Martinez] continues to escalate predictably as his condition worsens." One

example of the financial burden imposed by his medical condition required the state to spend more than $500,000 in hospital bills, and incur a $750,000 "loss in a lawsuit over [Department of Corrections and Rehabilitation's] neglect" in allowing Martinez to be "in a state of sepsis and close to death" due to a "pressure ulcer on the area of [Martinez's] coccyx" that had become infected. According to Karan, the cost of caring for Martinez need not be assumed by the state because his parents and personal physician are willing and capable of providing the care he will require for the remainder of his life.

On March 13, 2008, the warden and the chief medical officer recommended the recall of Martinez's sentence for the following reasons: "[Martinez] is considered permanently paralyzed from the neck down. [¶] [He] did not have the medical condition at the time of sentencing. [¶] [He] does not pose a threat to public safety; he is totally dependent on his care givers for his needs. [¶] There are family members who have expressed a desire to care for [him] should an early release be granted." However, the head of California's Department of Corrections and Rehabilitation, Division of Adult Institutions (CDCR), disagreed.

On April 7, 2008, CDCR recommended BPH "deny the compassionate release of [Martinez]" because of the "seriousness of his commitment offense" and the fact his "institutional adjustment is considered less than satisfactory based on the six Rules Violation Reports (RVR) (four for Disrespect to Staff, one for Behavior that can Lead to Violence (verbal), and one for Violation of Grooming Standards) he has received" while at Corcoran State Prison. CDCR emphasized that "[Martinez] is a quadriplegic who continues to demonstrate inappropriate, disrespectful, and verbally threatening behavior. While [his] physical threat is obviously restricted, his defiant demeanor could be perceived as threatening. Although he is eligible for [section] 1170[, subdivision] (e)(2)(C) consideration based on his permanently medically incapacitated status and required 24-hour total nursing care, given the seriousness of his commitment offense and his continuously exhibited aggressive and verbally abusive behavior, a recommendation for his early release does not appear to be in the interest of justice."

There can be no doubt that Martinez's behavior following his incapacitation has been inappropriate and disrespectful.

On one occasion, after Martinez had been assisted to a toilet chair, he complained he was "in an unsafe position" and believed that he was going to fall. He ordered the nurse to get the supervisor. Rather than do so, the nurse informed him that he was seated safely on the toilet chair. Martinez responded by calling the nurse "incompetent" and "stupid," and stating: "You obviously don't know who you're dealing with. . . . You're one of those real

smart ones[,] aren't you[?] You're lucky I can't walk. . . . I'd kick your ass. I don't have to worry though, someone will get you."

On another occasion, Martinez asked a female nurse to place him in a seated position before inserting a catheter into his urethra. When the nurse refused (because Martinez had previously become aroused while watching her catheterize him in a sitting position) and explained there was no medical reason for him to be seated during the procedure, Martinez called her an "obnoxious ghetto rat." While the nurse was transferring him to bed with a Hoyer lift, Martinez told her to "shut [her] suck-hole," threatened to urinate on the Hoyer lift, and told her that "he'd call [her] the 'N' word, but [would] wait until another time" for that indignity.

On yet another occasion, Martinez became agitated while another nurse was conducting pressure relief and yelled: "Get the hell out of my room, did you hear, get the fuck out of my room[.] . . . Get your fucking dirty hands off me."

Two weeks later, Martinez again became belligerent with the same nurse, again yelling: "Get the hell out of my room." When the nurse supervisor entered the room, Martinez accused the nurse of being "incompetent." Then, looking at the nurse, Martinez said: "You probably don't even know how to spell incompetent." When the supervisor told Martinez to "quit screaming at the nurses and to watch his profanity," he looked at her and said: "You better watch it."

On May 2, 2008, Attorney Karan sent a letter to BPH rebutting CDCR's accounts of Martinez's conduct and stating that section 1170, subdivision (e) required BPH to consider two, and only two, criteria in deciding whether to make the recall recommendation: (1) whether Martinez was permanently medically incapacitated and unable to perform activities of basic daily living, thus requiring 24-hour total care, and (2) whether the conditions under which he would be released or receive treatment do not pose a threat to public safety. Karan argued that, despite conceding that Martinez falls within the first of these criteria, and effectively conceding that he poses no actual threat to public safety, CDCR based its recommendation on inappropriate considerations, such as the seriousness of his crimes and an exaggerated reading of his disciplinary record.

On June 17, 2008, BPH rejected the request for "Compassionate Release—Penal Code section 1170(e)." Its decision simply stated: "Decline to refer to court for consideration of sentence recall."

Martinez then filed a complaint for injunctive and declaratory relief and a petition for writ of mandate, asking the superior court to compel BPH to recommend the recall of Martinez's sentence.

BPH's answer asserted Martinez was not entitled to mandamus relief because BPH's decision whether to recommend an inmate for recall of sentence is "purely discretionary" and BPH appropriately had considered not only whether Martinez was "permanently medically incapacitated" (§ 1170, subd. (e)(2)(C)) and whether his release would "pose a threat to public safety" (§ 1170, subd. (e)(2)(B)), but also whether his release would be inconsistent with section 1170, subdivision (a)(1), "stat[ing] that the purpose of imprisonment is punishment, and that the purpose is best served when a prisoner serves a term that is proportionate to his offense." Therefore, BPH argued, the nature of Martinez's commitment offense must be considered when deciding whether he is eligible for recall under section 1170, subdivision (e).

On December 31, 2008, the trial court issued a writ of mandate directing BPH to set aside its denial of Martinez's request and to recommend that his sentence be recalled pursuant to section 1170, subdivision (e)(2)(B) and (C).

The trial court explained its ruling as follows:

"[BPH's] denial of [Martinez's] request for a recommendation of recall constitutes an abuse of [its] discretion under subdivision (e) of section 1170 in three respects. First, [BPH] failed to make any findings, as required by the last sentence in subdivision[] (e)(2) and in subdivision (e)(6) of section 1170.[1]

"Second, [BPH] considered factors and criteria outside the scope of its authority under subdivision (e) of section 1170, including the legislative finding and declaration in subdivision (a)(1) of section 1170 that prisoners' sentences [should] be proportionate to the seriousness of their offenses. [BPH] improperly considered subdivision (a)(1) in denying [Martinez's] request under subdivision (e) by misconstruing the introductory clause to the first sentence of subdivision (e): 'Notwithstanding any other law and consistent with paragraph (1) of subdivision (a), if the secretary [of the Department of Corrections and Rehabilitation] or [BPH] or both determine that a prisoner satisfies the criteria set forth in paragraph (2), the secretary or [BPH] may recommend to the court that the prisoner's sentence be recalled.' In the introductory clause of this sentence, the Legislature essentially declares that [BPH's] authority to make a recall recommendation, as specified in the main clause of the sentence, is not precluded by any other law and is consistent with subdivision (a)(1) of section 1170. The introductory clause does not, as [BPH] contend[s], add a criterion of consistency with subdivision (a)(1) to

---

[1] As we have noted, BPH does not challenge the superior court's ruling that the statutory scheme requires BPH to make findings when it rejects a request to recommend recall of sentence.

the criteria to be considered by [BPH] in determining whether to make a recall recommendation under subdivision (e) of section 1170. Further, the conditional clause of the sentence, beginning with 'if,' makes clear that the sole criteria to be considered by [BPH] in exercising its authority under section 1170(e) are 'set forth in paragraph (2),' i.e., subdivision (e)(2) of section 1170.[2]

"Third, [BPH's] denial of [Martinez's] request for a recall recommendation lacks an evidentiary basis. All of the evidence before [BPH] satisfies the criteria for a recall recommendation under subdivision (e)(2) of section 1170: [He] has lost muscular and neurological function, is permanently paralyzed from the neck down, is unable to perform activities of basic daily living and requires 24-hour total care as a result of a lacerated spinal cord sustained during an attack at Centinela State Prison (subdivision (e)(2)(C) of section 1170); given [his] total physical dependence on others, the plan for his release to the care of family members does not pose a threat to public safety (subdivision (e)(2)(B) of section 1170); and [he] is not sentenced to death or a term of life without the possibility of parole (last sentence of subdivision (e)(2) of section 1170). None of the evidence supports findings that [Martinez] fails to meet one or more of the criteria for a recall recommendation under subdivision (e)(2). Thus, [BPH] can reasonably exercise its authority under subdivision (e) of section 1170 in only one way: it can only determine that the criteria for a recall recommendation are satisfied and proceed to make that recommendation to the court that sentenced [Martinez]."

BPH filed a timely notice of appeal.[3]

DISCUSSION

I

The interpretation of section 1170, subdivision (e) is a question of law that we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24

---

[2] As noted earlier, BPH does not challenge the superior court's ruling that, in determining whether to recommend the recall of a sentence, BPH is limited to the specific criteria set forth in subdivision (e)(2) of section 1170.

[3] We granted the application of Justice Now, an organization providing pro bono legal representation to California's prison population, to file a brief as amicus curiae in support of Martinez's position. BPH then moved to strike the brief "because amicus curiae attached materials not contained in the record in violation of California Rules of Court, rule 8.204(d)." To the extent that the amicus curiae brief relies on information from outside the appellate record, we have ignored it. (See, e.g., *Berg v. Traylor* (2007) 148 Cal.App.4th 809, 812, fn. 2 [56 Cal.Rptr.3d 140]; *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1560–1561 [1 Cal.Rptr.3d 245].)

Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; *Vidrio v. Hernandez* (2009) 172 Cal.App.4th 1443, 1452 [92 Cal.Rptr.3d 178].)

Section 1170, subdivision (e)(1) states: "Notwithstanding any other law and consistent with paragraph (1) of subdivision (a), if [CDCR] or [BPH] or both determine that a prisoner satisfies the criteria set forth in paragraph (2), [CDCR] or [BPH] *may* recommend to the court that the prisoner's sentence be recalled." (Italics added.) Paragraph (2) states: "The court shall have the discretion to resentence or recall if the court finds that the facts described in subparagraph (A) and (B) or subparagraphs (B) and (C) exist: [¶] (A) The prisoner is terminally ill with an incurable condition caused by an illness or disease that would produce death within six months, as determined by a physician employed by the department. [¶] (B) The conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety. [¶] (C) The prisoner is permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour total care, including, but not limited to, coma, persistent vegetative state, brain death, ventilator-dependency, loss of control of muscular or neurological function, and that incapacitation did not exist at the time of the original sentencing. [¶] [BPH] shall make findings pursuant to this subdivision before making a recommendation for resentence or recall to the court. This subdivision does not apply to a prisoner sentenced to death or a term of life without the possibility of parole." (§ 1170, subd. (e)(2).) "Any recommendation for recall submitted to the court . . . shall include one or more medical evaluations, a postrelease plan, and findings pursuant to paragraph (2)." (§ 1170, subd. (e)(7).) If, after a hearing held within 10 days "of receipt of a positive recommendation" (§ 1170, subd. (e)(3)), the court "grants the recall and resentencing application, the prisoner shall be released by [CDCR] within 48 hours of receipt of the court's order, unless a longer time period is agreed to by the inmate. . . ." (§ 1170, subd. (e)(9).)

BPH contends that use of the words "may recommend to the court that the prisoner's sentence be recalled" reflects the Legislature's intent to confer broad discretion, not a mandatory duty, upon BPH whether to recommend recall of a prisoner's sentence if the facts regarding the prisoner's condition satisfy the statutory criteria. Pointing out that other paragraphs of subdivision (e) use the word "shall" (§ 1170, subd. (e)(2)(C), (3), (4), (5), (7), (9), (10)), BPH says this shows the Legislature understood and intended the permissive nature of "may" and the mandatory nature of "shall." Thus, BPH concludes, it "did not have a mandatory duty to recommend that Martinez's sentence be recalled, [and] Martinez was not entitled to a writ of mandate."

Martinez disagrees. In his view, "may" in section 1170, subdivision (e)(1) "*authorizes* [BPH] to carry out the purpose of the recall provisions *if* it finds

that the criteria are met. Because the statute *requires* [BPH] to find whether the criteria are met before carrying out its authority to recommend a recall, once it does, it *must* exercise its authority to recommend for or against a recall. To find otherwise is to defeat the purpose of the statute." According to Martinez, BPH's interpretation of the statute would lead to the absurd result that BPH would have "plenary discretion to recommend or not recommend a recall . . . regardless of the facts." Martinez concludes that, when a prisoner meets the criteria for recall, "the only way [BPH] can reasonably exercise its discretion is to recommend a recall."

In seeking to ascertain the intent of the Legislature in order to effectuate the purpose of section 1170, subdivision (e), we begin by observing that "may" is "a common grammatical term encompassing multiple meanings, including an expression of 'ability' or 'power' as well as 'permission.' [Citation.]" (*People v. Ledesma* (1997) 16 Cal.4th 90, 95 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) Thus, unless a code expressly defines "may" as permissive and "shall" as mandatory, "judicial authorities have construed 'may' as both discretionary and mandatory," depending on its context in the entire language of the statute, and the statute's "history." (*Ibid.*, citing, e.g., *In re Richard E.* (1978) 21 Cal.3d 349, 354 [146 Cal.Rptr. 604, 579 P.2d 495] ["The ordinary import of 'may' is a grant of discretion."]; *Harless v. Carter* (1954) 42 Cal.2d 352, 356 [267 P.2d 4] [" 'Where persons or the public have an interest in having an act done by a public body "may" in a statute means "must." ' " (italics omitted)]; *Hollman v. Warren* (1948) 32 Cal.2d 351, 356 [196 P.2d 562] ["may" construed as mandatory in Gov. Code, § 8200, which, in 1948, stated in part that the " 'Governor may appoint and commission notaries public for the several counties of the State in such number as he deems necessary for the public convenience' "; the court held that authority *must* be exercised " 'whenever a proper case for its exercise is presented' " (*id.* at pp. 354–355) because "[i]t is not to be supposed that the Legislature intended to leave it to the whim or caprice of the governor as to whether there should be any notaries appointed" (*id.* at p. 356) (the statute has since been amended to give that power of appointment to the Secretary of State, not to the Governor)]; see also *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610] [" 'may' is ordinarily construed as permissive, whereas 'shall' is ordinarily construed as mandatory . . ."]; *Mass v. Board of Education* (1964) 61 Cal.2d 612, 622–623 [39 Cal.Rptr. 739, 394 P.2d 579] [where it appears in a statute defining a public duty, "may" is considered mandatory]; Black's Law Dict. (8th ed. 2004) p. 1000, col. 2 ["In dozens of cases, courts have held *may* to be synonymous with *shall* or *must*, usu. in an effort to effectuate legislative intent."].)

The Penal Code does not define the words "may" and "must" used in the code; rather, it says "[w]ords and phrases [in the Penal Code] must be

construed according to the context and the approved usage of the language . . . ." (§ 7, subd. 16.) Hence, in determining what the Legislature intended by the words "may" and "shall" in section 1170, subdivision (e), we have to " 'accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose . . .' [citation] . . . 'construing its words in context . . .' [citation] . . . ' " 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " ' " (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].)

The legislative history of section 1170 reveals the so-called compassionate release provision of subdivision (e) was added to the statute in 1997 to provide in part that "if the Director of Corrections or the Board of Prison Terms or both determine that a prisoner satisfies the criteria set forth in paragraph (2), the director or the board may recommend to the court that the prisoner's sentence be recalled. [¶] (2) The court shall have the discretion to resentence or recall if the court finds both of the following: [¶] (A) The prisoner is terminally ill with an incurable condition caused by an illness or disease that would produce death within six months, as determined by a physician employed by the department. [¶] (B) The conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety. [¶] The Board of Prison Terms shall make findings pursuant to this subdivision before making a recommendation for resentence or recall to the court. This subdivision does not apply to a prisoner sentenced to death or a term of life without the possibility of parole." (Assem. Bill No. 29 (1997–1998 Reg. Sess.) § 1 (Assembly Bill 29); Stats. 1997, ch. 751, § 1, p. 5070.)[4]

The purpose of Assembly Bill 29 was not just compassion; it was to save the state money. An Assembly Committee on Public Safety analysis states: "According to the author, 'Prisons were never intended to act as long term health care providers for chronically ill prisoners. As the prison population ages, we will be faced with this situation more often. These inmates consume a disproportionate amount of the CDC[R]'s budget. The current release

---

[4] As originally proposed, Assembly Bill 29 would have included prisoners who are "[p]ermanently and severely physically incapacitated" and would have added a legislative finding to subdivision (a)(1) stating "the purpose of incarceration was punishment[,] and that purpose was no longer served by the continued incarceration of certain inmates who were terminally ill with less than six months to live who were permanently and severely incapacitated, provided they no longer pose a risk to public safety." (Assem. Com. on Public Safety, Conc. in Sen. Amends. to Assem. Bill No. 29 (1997–1998 Reg. Sess.) as amended July 1, 1997, p. 1; see also Sen. Com. on Public Safety, Analysis of Assem. Bill No. 29 (1997–1998 Reg. Sess.) as amended Apr. 10, 1997, p. 3; Legis. Counsel's Dig., Assem. Bill No. 29 (1997–1998 Reg. Sess.) as amended Apr. 10, 1997.) However, those provisions were deleted by the Senate. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 29 (1997–1998 Reg. Sess.) as amended Sept. 10, 1997.)

program operated by CDC[R] needs to be streamlined and codified. If this bill is enacted, the state will be able to release these prisoners and recover 50 percent of their health care[] costs through Medicaid.' [¶] . . . [¶] The bill is frankly an attempt to fast track the release of prisoners with AIDS and other terminal illnesses if the CDC[R] and/or the [BPH] recommend release via the recall procedure. . . . [¶] . . . According to the author, health care costs alone in California prisons cost the state $372 million, more than 36 states spend on their entire prison budgets. . . . [¶] . . . According to the sponsor, Catholic Charities of the East Bay/AIDS in Prison Project, 'The annual cost of incarcerating a healthy prisoner is $21,000; a terminally ill prisoner incurs costs of over $75,000 annually. Outside hospital visits for prisoners (contract hospital bed plus custody costs) total more than $4,000 per day.' " (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 29 (1997–1998 Reg. Sess.) Apr. 15, 1997, p. 2.) A Senate Appropriations Committee analysis reported that there "would be unknown cost savings due to reduced incarceration. In addition, to the extent that medical care provided outside a penal institution is less expensive due to the absence of security personnel, and security measures, there would be unknown, potentially significant, medical care cost savings." (Sen. Com. on Appropriations, Rep. on Assem. Bill No. 29 (1997–1998 Reg. Sess.) as amended July 1, 1997, p. 1.)

Ten years later, the Legislature passed Assembly Bill No. 1539 (2007–2008 Reg. Sess.), which an Assembly Committee on Public Safety analysis referred to as the "Medical Release and Fiscal Savings Bill." (Assem. Com. on Public Safety, Conc. in Sen. Amends. to Assem. Bill No. 1539 (2007–2008 Reg. Sess.) as amended July 5, 2007, coms., p. 6.) The Legislative Counsel's Digest summarized the bill as amending section 1170, subdivision (e) to "extend those provisions for early release to prisoners who are permanently medically incapacitated and whose release is deemed not to threaten public safety." (Legis. Counsel's Dig., Assem. Bill No. 1539 (2007–2008 Reg. Sess.).) In pertinent part, the bill amended section 1170, subdivision (e)(2) to add another circumstance in which CDCR or BPH, or both "may recommend to the court that the prisoner's sentence be recalled," and the "court shall have the discretion to resentence or recall": "(C) The prisoner is permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour total care, including, but not limited to, coma, persistent vegetative state, brain death, ventilator-dependency, loss of control of muscular or neurological function, and that incapacitation did not exist at the time of the original sentencing," and "(B) The conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety." (Stats. 2007, ch. 740, § 1.)

Again, the legislative history reflects that the purpose of the provision is not just compassion; it is to save the state money. The Senate Rules

Committee Floor Analysis reported that, in support of the bill, the Los Angeles County District Attorney's Office stated: " 'The release of terminally ill and permanently medically incapacitated prisoners who pose no risk to the public will result in substantial cost savings to the State and will help to reduce prison overcrowding.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1539 (2007–2008 Reg. Sess.) as amended July 5, 2007, p. 7.) An Assembly Committee on Public Safety analysis said: "According to the author, 'The compassionate release law was enacted because prisons should not act as long term health care providers for terminally ill prisoners. Their care comprises a disproportionate portion of the CDCR's budget. This bill, the Medical Release and Fiscal Savings Bill, seeks to modify the CDCR compassionate release process by increasing the awareness of CDCR staff and families of terminally ill prisoners regarding the compassionate release process, and to extend the reach of the law to include prisoners who are permanently medically incapacitated, significantly increasing fiscal savings from their release.' " (Assem. Com. on Public Safety, Conc. in Sen. Amends. to Assem. Bill No. 1539 (2007–2008 Reg. Sess.) as amended July 5, 2007, coms., p. 6.)[5]

 Thus, we must interpret the word "may" in the phrase "the board may recommend to the court that the prisoner's sentence be recalled [if the prisoner meets the criteria set forth in subdivision (e) of section 1170]" in a way that effectuates the provision's primary purpose of saving the state money by authorizing the release from prison custody of those inmates who are terminally ill or permanently medically incapacitated and do not pose a threat to public safety. (§ 1170, subd. (e)(1).) In this light, the word "may" has to be read to mean that BPH may (in the sense of being authorized to do so) recommend the recall of sentence and release of such an inmate, but must so recommend if the prisoner meets the statutory criteria. Stated another way, the fiscal purpose of the legislation would be thwarted if BPH has the discretion to not recommend recall of sentence and release even if the statutory criteria are met. The superior court correctly so ruled.

And—as Martinez contends, BPH does not now dispute, and the superior court held—only facts relating to the criteria set forth in section 1170, subdivision (e)(2)(A), (B), and (C) may be considered by BPH in determining whether a prisoner is eligible for resentencing and release from custody pursuant to this statutory scheme.

---

[5] In opposition, the California District Attorneys Association argued the bill " 'runs counter to the notion that a person convicted of a crime should serve his or her sentence.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1539 (2007–2008 Reg. Sess.) as amended July 5, 2007, p. 8.)

Nevertheless, BPH contends the superior court erred because, under the facts of this case, BPH "was not compelled to exercise its discretion to find Martinez posed no threat to public safety" if released from state prison. We turn to that issue now.

II

■ Before BPH can recommend to a sentencing court that a prisoner's sentence be recalled and the prisoner be released pursuant to section 1170, subdivision (e), BPH must find not only that the prisoner's physical condition satisfies the criteria in subdivision (e)(2)(A) or (C), but also that the "conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety." (§ 1170, subd. (e)(2)(B).)

Thus, even if BPH finds that the prisoner meets the first test, it must deny the prisoner's request for recall of sentence if BPH cannot find, given the evidence before it, that the conditions of release do not pose a threat to public safety. Eliminating the double negative, this means BPH must deny the request if it finds that the prisoner could be a threat to public safety if released.[6]

BPH argues that based on the gravity of Martinez's commitment offenses and his "continued antisocial and threatening behavior" in state prison, BPH "could find that[, despite his quadriplegia,] Martinez posed a public safety threat [if released from state prison]."

■ When BPH declines to recommend a prisoner for recall of sentence because it finds the prisoner could pose a threat to public safety if released from state prison, the standard of judicial review is the same as that used when reviewing a decision by BPH to deny parole, i.e., "whether 'some evidence' supports the conclusion" of BPH that the prisoner does not come within the statutory criteria. (See *Lawrence, supra,* 44 Cal.4th at p. 1191.) This standard of review is "highly deferential" to BPH's factfinding. (*Id.* at p. 1204.) It does not permit a court to second-guess BPH's factfinding. Our

---

[6] Our dissenting colleague asserts that, "[g]iven the overall purpose of the statute to avoid the needless expenditure of funds, and given the current fiscal crisis faced by the State," he "would adopt a standard for continued incarceration that requires the evidence to show a *reasonable* possibility that a quadriplegic would pose a threat to public safety if released." (Conc. & dis. opn., *post,* at p. 599.) We decline to read into the statute a test the Legislature could have included but did not. Saying our construction of the statute is flawed because, "by [that] test, nobody will ever get out of prison" is unwarranted exaggeration. (Conc. & dis. opn., *post,* at p. 599.) The law presumes BPH will properly apply the criteria (Evid. Code, § 664), and its decision is subject to court scrutiny. In any event, if there is a flaw in the statute, it must be fixed by the Legislature not by us. (*In re Brent F.* (2005) 130 Cal.App.4th 1124, 1130 [30 Cal.Rptr.3d 833].)

role is narrow. A court has the authority to do no more than "ensure that [BPH's] decision reflects 'an individualized consideration of the specified criteria' and is not 'arbitrary and capricious' " (*id.* at p. 1205), i.e., that BPH's decision is supported by " 'some evidence' " viewed in the light most favorable to the decision (*id.* at p. 1204).

Here, the superior court examined the evidence presented to BPH and independently concluded, as a matter of law, that it satisfies the statutory criteria for the recall of Martinez's sentence and his release from state prison. In the superior court's words, BPH "can reasonably exercise its authority under subdivision (e) of section 1170 in only one way: it can only determine that the criteria for a recall recommendation are satisfied and proceed to make that recommendation to the court that sentenced [Martinez]." As we will explain, this conclusion does not give appropriate deference to BPH's implied factual finding that Martinez could pose a threat to public safety if released from prison.

BPH had before it the vile nature of Martinez's commitment offenses. The 32-year-old prisoner had "run[] his car into two (2) young women, pinning one of them beneath it. After he pulled the incapacitated victim out, she resisted his attempts to place her in the back seat of his vehicle. Holding her by the throat, he then punched her in the face, breaking her nose. Afterwards driving her to another location, he forcibly performed various sex acts upon her person and forced her to perform sex acts upon him, saying that he had a gun. He was arrested when local police on patrol found [him] and the victim in the car, both covered in blood."

And BPH knew that Martinez continued to deny having committed the offenses as charged and sought to minimize his responsibility for his "behavior," suggesting it was caused by "his insulin level" not having "been more closely monitored by his family physician."

BPH also knew that Martinez had "an extensive arrest history dating back to 1987 and consist[ing] of arrests for Receiving Stolen Property, Carrying a Loaded Firearm in Public, Carrying a Concealed Weapon, Obstructing/Resisting a Public Officer, Assault with a Deadly Weapon, Battery, Damage of Power Lines, and the instant offense[s] of Kidnap and Rape by Force and Fear," as well as "Forcible Oral Copulation, Rape with Foreign Object, Assault with a Deadly Weapon, Hit and Run with Injury," and "Battery with Serious Injury."

In addition, BPH was aware that, after becoming quadriplegic in prison, Martinez continued his antisocial behavior by verbally abusing and threatening prison nurses. He called one nurse an "obnoxious ghetto rat," told her

"he'd call [her] the 'N' word, but [would] wait until another time" for that indignity, and threatened to urinate as she was transferring him to bed with a Hoyer lift. Becoming agitated on a different occasion, he told a nurse, "Get your fucking dirty hands off me" and "get the fuck out of my room." Twice, he threatened nurses with physical harm. He said to one nurse, "You're lucky I can't walk. . . . I'd kick your ass. I don't have to worry though, someone will get you." And, on a separate occasion, he warned another nurse, "You better watch it."

Is this "some evidence" to support BPH's implied factual finding that Martinez could be a threat to public safety if he were released from prison? It is obvious he does not alone possess the capability to hurt another physically. However, the question remains whether Martinez's criminal history of assaultive crimes, his wicked and brutal sexual attacks that led to his most current incarceration, and his repeated abuse of, and threats to, prison nurses reflect such deep-seated evilness and anger that, if released from prison, Martinez could enlist the assistance of someone to harm those who irritate him.

BPH impliedly found that Martinez could pose a threat to public safety if he is released from state prison. Might reasonable minds disagree? Sure. However, that is not our call as judges. We must be highly deferential to BPH's factfinding, with the recognition that BPH is entitled to be " 'cautious' " and " 'stringent' " in deciding whether "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety" (§ 1170, subd. (e)(2)(B)). (*Lawrence, supra,* 44 Cal.4th at p. 1204.) Accordingly, we must uphold BPH's decision if it is supported by some evidence viewed in the light most favorable to the decision. (*Ibid.*)

█ Surely, even those most sympathetic to Martinez because of his current condition, and those who feel it would be better for the state to save money by releasing him, should be troubled by his criminal history and threatening conduct in prison. BPH obviously was, and we cannot say that it acted arbitrary or capriciously in impliedly finding that defendant remains an evil, angry, and violent person who could seek the aid of others to threaten public safety. (See *Lawrence, supra,* 44 Cal.4th at p. 1205.)

Nevertheless, the matter must be returned to BPH because it did not explicitly articulate this dispositive factual finding. As the superior court correctly held, BPH did not make any of the findings required by section 1170, subdivision (e)(6); its decision simply stated: "Decline to refer to court for consideration of sentence recall." The matter also must be returned to BPH because, as the superior court found and BPH does not contest, BPH considered factors other than the criteria set forth in the statute.

In light of our disposition, *post*, Martinez is no longer the prevailing party. Thus, the superior court's orders awarding costs (Cal. Rules of Court, rule 3.1700) and "reserv[ing] jurisdiction to hear and determine a motion for attorneys fees" (Cal. Rules of Court, rule 3.1702) must be reversed.

We end our analysis by responding to the dissent's assessment of the facts. Our colleague discounts all the facts upon which BPH could rely in assessing whether the conditions of Martinez's release would not pose a threat to public safety. In doing so, the dissent incorrectly views the facts in the light most favorable to Martinez, rather than in the light most favorable to BPH's implied finding.

For example, pointing out that the warden and chief medical officer of Corcoran State Prison believed Martinez would not pose a threat to public safety if released from prison, the dissent agrees with them. However, they were not the decision makers. The head of the state prison system disagreed with their recommendation, and BPH was the finder of fact whose determination we must uphold if it is supported by some evidence viewed in the light most favorable to BPH. Therefore, the opinions of the warden and chief medical officer of Corcoran State Prison are no basis upon which to overturn the implied finding of BPH.

The dissent characterizes Martinez's threats to prison nurses as "simply bar talk, tailgate talk," that reflects nothing more than "the common frustration of a quadriplegic man who is confined to prison and whose most private bodily functions must be monitored by prison nurses." (Conc. & dis. opn., *post*, at p. 601.) This characterization of the evidence ignores the fact that the words, "You better watch it," "someone will get you," were voiced to a female nurse by a man with a history of violence toward women and those he dislikes, and a man who, with the help of another such violent person, could carry out the threats.

Asserting that it is "utter speculation" to conclude Martinez could enlist the aid of others to harm those who irritate him, the dissent quotes Holmes for the proposition that " 'The life of the law has not been logic; it has been experience.' " (Conc. & dis. opn., *post*, at pp. 601, 598.) Well, experience has shown that quadriplegics can commit violent crimes. (*Quadriplegic Suspect— Police: Pulled Trigger with String in Mouth* (Sept. 9, 1987) Newsday ["A quadriplegic confined to a wheelchair thought his bride of two weeks was cheating on him and killed her by firing a pistol using a string in his mouth."]; Yaro, *Quadriplegic Con Man Faces Court Again—in Murder Case*, L.A. Times (May 7, 1984); Gettemy, *Armed Robbery Guilt Admitted by Quadriplegic*, L.A. Times (Oct. 31, 1972); *People v. Taibi* (N.Y.App.Div. 1991) 174 A.D.2d 585 [571 N.Y.S.2d 88] [quadriplegic tries to arrange for hit man to kill former business partner].)

That reasonable minds may believe it would be more prudent to save our cash-strapped state a lot of money by releasing Martinez from state prison custody[7]—or that, "given the [amount of money] Martinez is costing the State each year," our colleague is "willing to take the risk" Martinez will commit a serious crime if released—is not a legal basis for the judiciary to substitute such a judgment call for BPH's decision to not recommend his release. (Conc. & dis. opn., *post*, at p. 602.) Because the record contains some evidence supporting BPH's implied finding that, if released from state prison, Martinez could pose a threat to public safety—as have other quadriplegics who, experience has shown, are capable of committing violent crimes—we are compelled by law to overturn the trial judge's order directing BPH to recommend the recall of Martinez's sentence and his release from state prison.

## DISPOSITION

The judgment (order issuing a peremptory writ of mandate) is affirmed in part and reversed in part. The matter is remanded to the superior court with directions to vacate its order, dated December 31, 2008, and to enter a new order issuing a peremptory writ of mandate as follows: BPH shall be directed to set aside its denial of Martinez's request for a recommendation for recall of his sentence, and to reconsider the matter in compliance with the statutory criteria set forth in section 1170, subdivision (e), and make the findings required by the statute. The parties shall bear their own costs in this appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

Hull, J., concurred.

**SIMS, J.,** Concurring and Dissenting.—I concur in part I of the majority opinion. Consequently, I agree with the following conclusions of the majority opinion:

1. The Board of Parole Hearings (BPH) should have made findings as required by Penal Code section 1170, subdivision (e)(6);[1] and

2. In considering whether to recommend the recall of Steven C. Martinez's sentence, BPH should not have considered factors not found in section 1170; and

---

[7] Our dissenting colleague believes that, if Martinez is released from prison custody, "the state will not have to bear Martinez's medical expenses, because they will be assumed by [his] parents and by his personal physician." (Conc. & dis. opn., *post*, at p. 598.) But the record indicates Medi-Cal benefits will be sought.

[1] Undesignated statutory references are to the Penal Code.

3. BPH *must* recommend recall of Martinez's sentence if he meets the statutory criteria.

I respectfully dissent from part II of the majority opinion. I agree with the warden of Corcoran State Prison and with Superior Court Judge Lloyd G. Connelly that, on this record, defendant does not "pose a threat to public safety." (§ 1170, subd. (e)(2)(B).)

In construing these provisions of section 1170, we should have in mind the prescient thoughts of Justice Oliver Wendell Holmes who wrote, "The life of the law has not been logic; it has been experience." (Bartlett, Familiar Quotations (16th ed. 1992) p. 542 (Oliver Wendell Holmes, Jr., from The Common Law, 1881).)

The applicable provisions of section 1170 were adopted by the Legislature in 1997. As the majority acknowledge, "[t]he purpose of [Assembly Bill No. 29 (1997–1998 Reg. Sess.); Stats. 1997, ch. 751, § 1, p. 5070] was not just compassion; it was to save the state money." (Maj. opn., *ante*, at p. 590.)

If this was true in 1997, it must be one thousand times more true today, when the state finds itself in an unprecedented budget crisis. We are closing schools and clinics.[2] Fees at our state universities have been raised more than 30 percent in a single year.[3] As this opinion is written, the state faces a $19.9 billion budget deficit.[4]

The following evidence is uncontradicted on this record: that in the two years preceding the filing of quadriplegic Steven Martinez's petition, the state has spent more than $1.25 million on him alone. If he is released, the state will not have to bear Martinez's medical expenses, because they will be assumed by Martinez's parents and by his personal physician.

In my view, petitioner Martinez is a poster child for why Assembly Bill No. 29 was enacted in 1997.

The crucial question is whether "[t]he conditions under which the prisoner would be released . . . do not pose a threat to public safety." (§ 1170, subd. (e)(2)(B).) The warden and the medical officer of Corcoran State Prison concluded that, if released, Martinez would not pose a threat to public safety.

---

[2] Lewis, *Board Moves to Trim $55 Million Shortfall in general Fund*, Sacramento Bee (Feb. 12, 2009) page B1; Lambert, *Most school districts have geared up for cuts*, Sacramento Bee (July 23, 2009) page A1.

[3] Nealon, *Cal State price tag jumps—32 Percent*, Press-Enterprise (July 22, 2009) page D2.

[4] Yamamura, *State Worker Pay Cuts Urged*, Sacramento Bee (Jan. 8, 2010) page A1.

The trial court agreed with them. The majority disagree and find some evidence that Martinez would pose a threat to public safety if released.

In making this determination, I think it important to define the standard by which this test should be applied. The majority say that "BPH must deny the request [for recall of sentence] if it finds that the prisoner could be a threat to public safety . . . ." (Maj. opn., *ante*, at p. 593.) I take this to mean that BPH must deny the request if it finds any possibility, no matter how remote, that Martinez would be a threat to public safety if released.

I respectfully disagree with this test. The population eligible for recall of sentence under section 1170 consists of convicted felons who have been sentenced to state prison. Nobody in their right mind would ever find that there is *no chance* whatsoever that a convicted felon—even a quadriplegic— would commit another crime if released. I think that, by the majority's test, nobody will ever get out of prison. This cannot be what the Legislature intended when it enacted the recall-of-sentence provisions in 1997 to save money.

In deciding what test to apply to the question whether a prisoner would pose a threat to public safety if released, I think we should borrow a page from the private sector. These days, the private sector recognizes that most real world decisions must involve a degree of risk. (See, e.g., McCarthy & Sabnani, *Risk Governance Will Be the Talk in Corporate Boardrooms in 2010*, S.F. Daily J. (Dec. 28, 2009) pp. 1, 11.) The question is: What degree of risk is acceptable in the circumstances given the cost of preventing the risk? (See generally Renn, *Concepts of Risk: A Classification*, in Social Theories of Risk (Krimsky & Golding, edits., 1992) pp. 61–64.) It is obvious, I think, that it is possible anyone who has committed a felony may commit a felony in the future. Given the overall purpose of the statute to avoid the needless expenditure of funds, and given the current fiscal crisis faced by the state, I would adopt a standard for continued incarceration that requires the evidence to show a *reasonable* possibility that a quadriplegic would pose a threat to public safety if released.

By this standard, the record fails to support the petitioner's continued incarceration.

Thus, in considering whether the record contains evidence that Martinez would be a threat to public safety if released, it is helpful to have a concrete understanding of Martinez's situation, as set out in the uncontradicted report of S.A. Hepps, M.D., the Chief Medical Officer of Corcoran State Prison:

"Steven Martinez, P-23908 was incarcerated at Centinela State Prison. On February 3rd of 2001 he was attacked and sustained a knife injury to the right posterior neck which rendered him instantly quadriplegic. . . .

"Mr. Martinez sustained a laceration of the spinal cord at the C-3 level which caused immediate and complete quadriplegia, which has persisted from the moment of injury. He is only able to move his head to a very minimal degree. He has no motor power whatsoever in his arms or legs. In addition he is incontinent of urine and feces and he has no prior indication of the need to defecate and thus he frequently soils himself. His breathing is compromised by virtue of loss of the muscles of respiration. He originally had a tracheostomy which is now closed.

"Individuals who have this level of cervical spinal cord injury may develop severe contractures of the upper and lower extremities including feet and hands. The muscles atrophy (wither) and the skin loses its subcutaneous fatty padding becoming very thin and easily disrupted. Bone loss is extensive due to lack of movement. Weight loss is also extensive due to loss of muscle and bone mass.

"Martinez requires extraordinary nursing care because of his total inability to care for himself in any way. He requires feeding, frequent position changes (every two hours), wheelchairing, oral hygiene, cleaning of his body and bed clothing on a frequent basis due to his incontinence.

"Martinez's injury is of devastating magnitude because there is no effective rehabilitation or opportunity for real improvement. He requires care for every single human need. There is no neuro-surgical procedure that can repair the injury which is permanent and stationary. There is no regeneration of the spinal cord and the prognosis in individuals with this injury is dismal. They frequently develop respiratory complications[,] i.e. pneumonia because of poor ability to cough. In addition, they develop kidney infections and renal failure. Decubitus (bedsores) are a constant problem because of pressure on thin, unsupported skin against bony protuberances, even under the best of care and circumstances.

"In conclusion, Martinez has sustained one of the worst injuries that can happen to an individual. Though he has cognitive function, he has no other independent human capability. He is truly a prisoner within his own body and there is no hope for recovery."

Given Martinez's utter lack of motor function, it is extremely unlikely that he would commit a crime if released from prison.

In concluding the record contains some evidence that Martinez poses a threat to public safety, the majority rely first on "the vile nature of Martinez's commitment offenses." (Maj. opn., *ante*, at p. 594.) The offenses were ones where, acting alone, Martinez used a car to accomplish a series of sexual

assaults. However, as a quadriplegic, Martinez is not going to be driving a car nor sexually assaulting anyone if he is released.

The majority next find that Martinez would constitute a threat to public safety, if released, because "Martinez continued his antisocial behavior by verbally abusing and threatening prison nurses." (Maj. opn., *ante*, at p. 594.) But these utterances simply reflect the common frustration of a quadriplegic man who is confined to prison and whose most private bodily functions must be monitored by prison nurses. Thus, the Department of Physical Medicine and Rehabilitation at the University of Alabama publishes a brochure that is given to patients who have suffered spinal cord injuries. As pertinent, it reports: "Some people react to their injury with strong feelings of displeasure. You might lash out verbally or want to become physically violent toward others." (*Adjustment to Spinal Cord Injury* (2004) University of Alabama Department of Physical Medicine & Rehabilitation <http://www.spinalcord.uab.edu/show.asp?durki=45578> [as of Apr. 6, 2010].)

While it is true that defendant called the prison nurses disrespectful names, I do not agree with the majority that he seriously threatened the nurses with physical harm. Thus, he said to one nurse, "You're lucky I can't walk, . . . I'd kick your ass." In my view, this is simply bar talk, tailgate talk. Martinez could not kick at all, let alone kick someone's ass. Martinez also said, "I don't have to worry though, someone will get you." I do not see in this statement, which Martinez was completely unable to fulfill, that Martinez would constitute a threat to public safety if released to his family, who is waiting for him on the outside should the authorities let him out. And we should not overlook the fact that Martinez's family will take responsibility for his medical care if he is released.

In presently recognizing that, as a quadriplegic, Martinez is virtually unable to accomplish any physical harm himself, the majority posit the possibility that "if released from prison, Martinez could enlist the assistance of someone to harm those who irritate him." (Maj. opn., *ante*, at p. 595.)

This is utter speculation. There is nothing in the record to suggest that Martinez would do this. During his commitment offense, he acted entirely alone. There is no evidence of any prison misconduct, at any time by Martinez, accomplished in conjunction with other inmates. So far as the record discloses, he is not a member of a gang. Thus, I do not see how Martinez is more likely than anyone else to "enlist the assistance of someone to harm those who irritate him." Moreover, if this possibility serves as evidence to justify further incarceration, then no quadriplegic will ever get out, because anyone could always find someone to help commit a crime.

Citing three newspaper stories and one case, the majority say, "experience has shown that quadriplegics can commit violent crimes." (Maj. opn. *ante*, at p. 596.)

I have two points to make with respect to this argument.

The first is it demonstrates that, with the help of a good Internet search engine, you can prove anything, including that pigs can fly. (See, e.g., *Pigs really can fly . . . with the help of a trampoline* (Dec. 5, 2009) Telegraph.co.uk <http://www.telegraph.co.uk/news/newstopics/howaboutthat/6728968/Pigs-really-can-fly. . . .with-the-help-of-a-trampoline.html> [as of Apr. 6, 2010]; *When Pigs Fly, They Go 1st Class* (Oct. 29, 2000) The Washington Post, p. A04 <http://pqasb.pqarchiver.com/washingtonpost/access/62990404.html?FMT=ABS&FMTS=ABS:FT&date=Oct+29%2C+They+Go+1st+Class> [as of Apr. 6, 2010]; Rowland, *Sure Pigs Fly—But is that Art?* (Jan. 21, 1995) San Diego Union-Tribune, p. B3 <http://pqasb.pqarchiver.com/sandiego/access/1245539581.html?dids=1245539581> [as of Apr. 6, 2010].)

The second point is that the majority's citation of these quadriplegic crime stories actually supports my argument. Thus the majority's four accounts are drawn from the entire country and span a period of 38 years—from 1972 to the present. I am sure that if there were more stories of this ilk, the majority would have found them. Four stories in the country in 38 years is darn few. Indeed, the stories are written and reported because the commission of serious crimes by quadriplegics is so rare and bizarre that they are newsworthy. Thus I am willing to take the risk that petitioner Martinez will fire a pistol with a string in his mouth. Indeed, given the hundreds of thousands of dollars that Martinez is costing the state each year, it is a risk that we *all* must take.

Of course, as I have mentioned, whenever someone has committed a felony, there is some chance that the behavior will be repeated. However, on this record, nothing suggests that there is any *reasonable* possibility that Martinez would be a threat to others if released. The truth is that he poses a minuscule risk to public safety. Remember: four quadriplegic crimes in the United States in 38 years. At a time when we are closing our public schools and our public clinics, and are raising our tuition at our universities by more than 30 percent in one year, and are facing unheard-of budget deficits, we cannot afford the hundreds of thousands of dollars it is costing the state of California to keep this quadriplegic in prison because he has made not-very-serious threats against his nurses that he is utterly unable to fulfill.

Having reviewed the record in its entirety, I think the BPH is keeping Martinez in prison to punish him for his serious commitment offenses and for his disrespectful attitude toward prison nurses. In my view, these are not proper factors upon which to deny a petition under section 1170. Moreover, although Martinez may be released from prison if his petition is granted, he will forever be a prisoner in the quadriplegic body that resulted from his incarceration by the Department of Corrections.

I agree completely with the warden of Corcoran prison and with Superior Court Judge Lloyd G. Connelly. Petitioner Martinez does not pose a sufficient threat to public safety to justify his continued extraordinarily expensive incarceration. I would affirm the judgment of the trial court and order BPH to grant his petition.

Respondent's petition for review by the Supreme Court was denied July 28, 2010, S182732. George, C. J., did not participate therein.