Filed 6/30/16  P. v. Montoya CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALFRED CHAVEZ MONTOYA,<br><br>    Defendant and Appellant. | G052927<br><br>(Super. Ct. No. 97CF1374)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

Alfred Chavez Montoya appeals from a postjudgment order after the trial court denied his petition to recall his sentence and release him on compassionate release. Montoya argues the trial court abused its discretion by denying his petition. We disagree and affirm the postjudgment order.

FACTS

In May 1997, officers stopped Montoya's vehicle because he was not wearing a seat belt. When the officers asked for his identification, Montoya told them that he was on active federal parole for a murder conviction. Officers searched the car and found 16 bindles containing approximately 23.9 grams of methamphetamine. A jury found Montoya guilty of transporting methamphetamine (Health & Saf. Code, § 11379, subd. (a)), and simple possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)). In December 1998, the trial court found Montoya had suffered three prior strike convictions, two convictions for murdering United States Border Patrol agents in July 1967, and one conviction for robbery in 1959. The court sentenced Montoya to prison for 25 years to life for the transportation conviction and stayed the sentence on the simple possession conviction pursuant to Penal Code section 654.

In October 2015, Dr. Steven Paik recommended Montoya be considered for compassionate release. Paik reported Montoya, who was then 81 years old, had multifocal hepatocellular carcinoma. Prior cancer treatments were unsuccessful and Montoya was not a candidate for other treatments because he was frail. Doctors believed Montoya had six months to live.

The following month, the Board of Parole Hearings (BPH) approved a motion to recommend to the court that Montoya's sentence be recalled because Montoya had an incurable disease that would produce death within six months and his release would not pose a threat to public safety. The following month, the BPH sent a letter to the Orange County Superior Court that included the BPH's recommendation, an investigative report, a diagnostic study, and a medical evaluation.

2

These documents detailed Montoya's lengthy criminal history. In 1958, Montoya, while armed with a gun, and his brother Harold Montoya (Harold) robbed participants in a poker game at an apartment. Montoya was convicted of robbery in 1959 and sentenced to prison for five years to life.

The same year, Montoya was convicted of grand theft auto and sentenced to a consecutive prison term of six months to 10 years. In 1960, he escaped from a state prison camp and was returned to custody to serve a sentence of one year to life. He was paroled in May 1963 and arrested in June 1964 for grand theft. He served two years in prison and was paroled in 1966.

In 1967, Montoya and Florencio Mationg drove a pickup truck with a camper through a border check in San Diego County. Harold and Victor Bono were following them in a Navy surplus ambulance loaded with 583 kilograms of marijuana. At the checkpoint, two border patrol agents stopped Montoya's truck. After Montoya and Mationg answered a few questions, the agents permitted them to continue. The border patrol agents saw the ambulance and let it pass through. Border agents later stopped Montoya's truck and asked permission to search the camper. The ambulance stopped behind the agents. Montoya took the agents to the camper and opened it for inspection. Bono and Mationg drew their guns and disarmed the agents. Bono and Mationg instructed Montoya to take the ambulance to his home. Bono, Mationg, and Harold kidnapped the agents, drove them to a remote cabin, handcuffed them to a stove, and shot them execution style. Montoya was convicted of two counts of second degree murder and sentenced to prison for 30 years. He was paroled in 1980.

In 1983, Montoya violated parole by conspiring to import and distribute cocaine. He offered to sell kilograms of cocaine to a DEA informant and DEA agents and delivered 453.4 grams of marijuana to the agents. Montoya pleaded guilty to the cocaine charge and was sentenced to prison for seven years. Montoya was paroled in 1992.

Montoya returned to prison in 1995 following his arrest for domestic violence. He received diversion under Penal Code section 1000.6 and was paroled in 1996. About 14 months later, he was arrested for the May 1997 offenses for which he is currently imprisoned.

With respect to his conduct in prison, Montoya had one serious rule violation in 2010 for possessing tobacco. He did not cause problems with other inmates and had no pending disciplinary actions. Montoya worked as a painter, was a gifted artist, and received high praise for his work. Scott Kernan, the Undersecretary of Operations, opined Montoya would not pose a risk to public safety if released from prison and recommended his sentence be recalled. He characterized Montoya's institutional adjustment as "acceptable." If released, Montoya planned to live with Harold, who was paroled for good behavior after serving 15 years of his 30-year sentence. As of November 2015, Montoya was walking about a half mile to the paint shop daily and could perform all activities of daily living, but his prognosis of six months or less to live remained unchanged.

In December 2015, the trial court held a hearing on the BPH's recommendation. At the start of the hearing, the court reviewed Montoya's criminal history with defense counsel. Defense counsel argued Montoya should be released because of his "dire" health and the existence of a verified release plan. The prosecutor opposed the sentence recall and release because of Montoya's extensive criminal history. The prosecutor also noted the release plan provided Montoya would live with Harold, who was also convicted of the same murders. Defense counsel disagreed and noted the BPH had scrutinized Montoya before recommending his release. The court stated it would review the documents again in light of the parties' arguments and issue a decision.

Later, the trial court denied the BPH's recommendation in a minute order, stating: "Based on the record, the [c]ourt concludes that [Montoya], based on his

4

extensive criminal history which includes a conviction of murder, still poses a threat to public safety."

                                        DISCUSSION

        The BPH may recommend to the superior court that a prisoner's sentence be recalled and the prisoner be granted a compassionate release if it determines: (1) "[t]he prisoner is terminally ill with an incurable condition caused by an illness or disease that would produce death within six months, as determined by a physician employed by the department" (Pen. Code, § 1170, subd. (e)(2)(A), all further statutory references are to the Pen. Code); and (2) "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety" (§ 1170, subd. (e)(2)(B)). The BPH must make findings regarding a prisoner's eligibility for a sentence recall and compassionate release, and its recommendation to the superior court must be supported by at least one medical evaluation of the prisoner, a postrelease plan, and the BPH's eligibility findings. (§ 1170, subd. (e)(2), (7).)

        The superior court must conduct a hearing within 10 days of receiving the BPH's recommendation, and the hearing should, if possible, be conducted by the sentencing judge. (§ 1170, subd. (e)(3), (8).) "The court shall have the *discretion* to resentence or recall if the court finds that the facts described in subparagraphs (A) and (B) . . . exist[,]" i.e., if it finds the prisoner is suffering from a terminal illness that would result in death within six months, and the prisoner's release will not pose a risk to public safety. (§ 1170, subd. (e)(2), italics added.) The trial court reviews the BPH's finding under the some evidence standard of review. (*Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 593-594 (*Martinez*).)

        We review the trial court's decision to resentence or recall for an abuse of discretion. (*People v. Loper* (2015) 60 Cal.4th 1155, 1161, fn. 3 (*Loper*).) Although the *Loper* court recognized a trial court has the "discretion whether to release a prisoner for compassionate reasons," the court added "that discretion is not *unfettered* when evidence

                                            5

is presented satisfying the statutory criteria." (*Ibid.*, italics added. )  The trial court's factual finding a prisoner is ineligible for a sentence recall because he poses a threat to public safety must be supported by substantial evidence in the record.  (See *People v. Robinson* (2010) 47 Cal.4th 1104, 1126 [we uphold trial court's express or implied factual findings if supported by substantial evidence].)

Here, substantial evidence supported the trial court's determination Montoya posed a threat to public safety based on his extensive criminal history.  The record before us demonstrates that for the past 57 years, Montoya has spent about 80 percent of that time in custody after a string of convictions where he was unable to remain free for more than three years at a time without reoffending.  In 1959, Montoya was convicted of robbery and grand theft in separate offenses.  After his release in 1963, he was again convicted of grand theft in 1964.  Montoya remained free for one year, and in 1967 he was involved with Harold in the murder of two federal agents while transporting 583 kilograms of marijuana for which Montoya served 13 years.  Three years after his release, Montoya was convicted of conspiring to import and distribute cocaine.  Three years after his release for that offense, Montoya was convicted of domestic violence.  Montoya was released in 1996, and one year later he was arrested for the offense for which he is currently imprisoned.  Montoya's lengthy criminal history, including the murder of two federal agents while transporting drugs, demonstrates he has not learned from his mistakes and is unable to conform his conduct to the law.

Two things stand out.  After serving 13 years in prison for the murder of two federal agents while transporting large quantities of marijuana, Montoya was released at the age of 46 years old.  Three years later, at 49 years of age, Montoya delivered large quantities of marijuana to federal agents and offered to sell cocaine to them.  At 63 years old, Montoya was arrested while transporting a significant amount of methamphetamine.  This evidence demonstrates that regardless of Montoya's age, he is unable to conform his conduct to the law and continues to be a threat to the public.

6

Additionally, Montoya's medical condition had not limited his physical mobility. The evidence before the trial court demonstrated Montoya walked about a half mile to the paint shop every day and could perform all daily personal activities. The circumstances of Montoya's planned release are relevant to this issue as well. If released, Montoya planned to live with Harold, who was also convicted of second degree murder in 1967. Evidence Montoya could not conform his conduct to the law, his continued physical mobility, and his plan to live with the one person with whom he committed his most violent crime was sufficient evidence for the trial court to conclude that so long as Montoya could walk he posed a threat to public safety.

Citing to *Martinez, supra,* 183 Cal.App.4th 578, Montoya correctly states one of the Legislature's purposes in enacting section 1170 was to save money. The *Martinez* court explained the Legislature's dual purposes behind section 1170, subdivision (e), were to provide compassion to dying prisoners and to save money by relieving state prisons of the obligation to provide expensive end-of-life medical care. (*Martinez, supra,* 183 Cal.App.4th at pp. 590-592; accord, *Loper, supra,* 60 Cal.4th at p. 1160.) But the goal of saving money must be balanced against protecting the public, otherwise courts would be required to release all dying prisoners. Finances don't trump public safety.

Next, Montoya asserts the trial court's "mechanized or categorical approach" to exclude "the whole class of persons who have" suffered a murder conviction violated his due process rights because the court refused to exercise its discretion. The record refutes Montoya's assertion. The trial court's comments indicate it heard and considered counsels' arguments and reviewed the documents at least twice. The court clearly considered evidence of Montoya's criminal history along with all the other evidence it was provided and exercised its discretion. That the court did not exercise its discretion in Montoya's favor does not establish a violation of due process, or equal protection, rights.

7

Finally, Montoya, in the last sentence of his opening brief and without citation to any legal authority, claims that because the trial court did not apply section 1170 in a fair manner he suffered cruel and unusual punishment under the federal and California constitutions. Because Montoya has failed to cite relevant case authority and present reasoned argument supported by relevant legal principles, he has forfeited the issue on appeal. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Stanley* (1995) 10 Cal.4th 764, 793.) Thus, the trial court did not abuse its discretion by denying the BPH's recommendation for compassionate release.

## DISPOSITION

The postjudgment order is affirmed.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.