Filed 3/29/13  P. v. McCarty CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH LEE MCCARTY,<br><br>    Defendant and Appellant. | A135608<br><br>(Lake County<br>Super. Ct. Nos. CR5321, CR5278,<br>CR5313) |

In 2002, appellant Kenneth Lee McCarty was sentenced to serve 23 years and eight months in state prison upon his guilty plea to first degree burglary (Pen. Code, § 459),[1] possession of a controlled substance for sale (Health & Saf. Code, § 11378), and defrauding an innkeeper (§ 537, subd. (a)(2)).  While in prison, McCarty was diagnosed with multiple sclerosis.  In 2012, the Office of the Secretary of the California Department of Corrections and Rehabilitation (CDCR) recommended that the superior court recall McCarty's sentence, pursuant to section 1170, subdivision (e)(1), providing for early release of medically incapacitated or terminally ill prisoners.  The superior court held a hearing and denied the request.  McCarty appealed, arguing that the trial court's findings are not supported by the record and that the trial court misconstrued the statutory language.  Subsequent to filing this appeal, McCarty passed away in prison.  We therefore dismiss his appeal as moot.

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

# I. STATUTORY BACKGROUND

Before addressing the facts unique to this case, we first discuss the governing statute. Section 1170, subdivision (e), provides, in relevant part: "(1) Notwithstanding any other law and consistent with paragraph (1) of subdivision (a), if the secretary or the Board of Parole Hearings [(Board)] or both determine that a prisoner satisfies the criteria set forth in paragraph (2), the secretary or the [B]oard may recommend to the court that the prisoner's sentence be recalled. [¶] (2) The court shall have the discretion to resentence or recall if the court finds that the facts described in subparagraphs (A) and (B) or subparagraphs (B) and (C) exist: [¶] (A) The prisoner is terminally ill with an incurable condition caused by an illness or disease that would produce death within six months, as determined by a physician employed by the department. [¶] (B) The conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety. [¶] (C) The prisoner is permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour total care, including, but not limited to, coma, persistent vegetative state, brain death, ventilator-dependency, loss of control of muscular or neurological function, and that incapacitation did not exist at the time of the original sentencing. [¶] The Board . . . shall make findings pursuant to this subdivision before making a recommendation for resentence or recall to the court. This subdivision does not apply to a prisoner sentenced to death or a term of life without the possibility of parole. [¶] (3) Within 10 days of receipt of a positive recommendation by the secretary or the [B]oard, the court shall hold a hearing to consider whether the prisoner's sentence should be recalled."

"The purpose of Assembly Bill 29[, which added subdivision (e) to section 1170 in 1997,] was not just compassion; it was to save the state money. An Assembly Committee on Public Safety analysis states: 'According to the author, "Prisons were never intended to act as long term health care providers for chronically ill prisoners. As the prison population ages, we will be faced with this situation more often. These inmates consume a disproportionate amount of the [CDCR]'s budget. . . . If this bill is

enacted, the state will be able to release these prisoners and recover 50 percent of their health care[] costs through Medicaid." [¶] . . . [¶] The bill is frankly an attempt to fast track the release of prisoners with AIDS and other terminal illnesses if the [CDCR] and/or the BPH recommend release via the recall procedure. . . . [¶] . . . According to the author, health care costs alone in California prisons cost the state $372 million, more than 36 states spend on their entire prison budgets. . . . ' (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 29 (1997–1998 Reg. Sess.) Apr. 15, 1997, p. 2.) A Senate Appropriations Committee analysis reported that there 'would be unknown cost savings due to reduced incarceration. In addition, to the extent that medical care provided outside a penal institution is less expensive due to the absence of security personnel, and security measures, there would be unknown, potentially significant, medical care cost savings.' (Sen. Com. on Appropriations, Rep. on Assem. Bill No. 29 (1997–1998 Reg. Sess.) as amended July 1, 1997, p. 1.)

"Ten years later, the Legislature passed Assembly Bill No. 1539 (2007–2008 Reg. Sess.), which an Assembly Committee on Public Safety analysis referred to as the 'Medical Release and Fiscal Savings Bill.' (Assem. Com. on Public Safety, Conc. in Sen. Amends. to Assem. Bill No. 1539 (2007–2008 Reg. Sess.) as amended July 5, 2007, coms., p. 6.) The Legislative Counsel's Digest summarized the bill as amending section 1170, subdivision (e) to 'extend those provisions for early release to prisoners who are permanently medically incapacitated and whose release is deemed not to threaten public safety.' (Legis. Counsel's Dig., Assem. Bill No. 1539 (2007–2008 Reg. Sess.).) . . . . [¶] Again, the legislative history reflects that the purpose of the provision is not just compassion; it is to save the state money." (*Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 590–591 (*Martinez*).)

## II.    FACTUAL AND PROCEDURAL BACKGROUND

McCarty's 2002 convictions involve his taking equestrian paraphernalia from a residence, his attempt to charge a room at a resort using a stolen credit card, and his sale, with a codefendant, of methamphetamine at a casino. McCarty had also called his ex-

3

girlfriend and threatened to kill her, her family, and her horse. A charge of making annoying phone calls was dismissed with a *Harvey* waiver.[2]

In March 2012, the CDCR's Undersecretary of Operations wrote to the superior court, recommending that McCarty's sentence be recalled pursuant to section 1170, subdivision (e). The letter stated that McCarty had been diagnosed with multiple sclerosis and was paralyzed from the neck down. McCarty was unable to use his arms and legs (with the exception of minimal movement of his right hand). However, he was awake, alert, and had a clear mental state. The letter indicated that McCarty, if released, would not pose a threat to public safety. However, it was also noted that McCarty's "institutional adjustment has been unacceptable; he has received five rules violations while in custody," and that McCarty's "criminal history include[d] arrests and/or convictions for burglary, grand theft, receiving stolen property, petty theft with priors, annoying phone calls, hit and run with property damage, driving with a suspended license, contempt of court, possession of a controlled substance, and forgery."

The superior court held a recall hearing, at which McCarty's uncle was the only witness. He testified that he was prepared to take full responsibility for McCarty's medical care. He understood that McCarty would require 24-hour care. The court also considered a diagnostic study and recommendation for release, McCarty's prison medical records, a letter from McCarty's primary care physician, letters in support of McCarty's release, and the 2002 probation report.

McCarty's primary care physician, Dr. Robert Rudas, wrote: "McCarty's case has progressed to the severity wherein he is paralyzed in all four extremities. He is not able to walk or functionally use his hands. He is not able to attend to any of [h]is activities of daily living. He requires total care in regards to nutrition, going to the bathroom, and bathing. His prognosis is profoundly poor with no likelihood of clinical improvement. If his condition continues to progress as it has in the past year his death is imminent in the range of a few weeks to 1–3 years. Once the multiple sclerosis starts affecting his ability

---

[2] *People v. Harvey* (1979) 25 Cal.3d 754.

4

to breathe, his demise would be forthcoming. [¶] If ever there would be a potential for the compassionate commutation of sentence, [McCarty] would be the case." The parties stipulated McCarty had an incurable disease, was expected to die within one year, and was physically incapacitated. It was also acknowledged that McCarty had been granted medical parole.[3]

The superior court did not resolve whether McCarty was permanently incapacitated, but did find, "I cannot be assured that he does not pose a threat to public safety." The court relied on the diagnostic study, which concluded that McCarty "retain[ed] the capacity to commit or to influence others to commit criminal acts that endanger public safety." His risk assessment score was "high." The diagnostic study also noted that McCarty had a prison disciplinary history, including battery on an inmate and three rules violation reports for fighting. It was further reported that "a documented victim or victim next of kin of the commitment offense . . . would suffer fear from the release of [McCarty] back into the community."

But, the court also went on to indicate that, even if the two statutory conditions were satisfied, it would still deny compassionate release. The court expressed concern that compassionate release, unlike medical parole, would be unconditional and without any mechanism to take McCarty back into custody.[4] With respect to compassion, the court said: "[W]hat you've got is somebody coming back to the criminal trough and taking another sip and taking another sip and taking another sip and, as I say, leaving a

---

[3] Section 3550, subdivision (a), provides: "Notwithstanding any other provision of law, except as provided in subdivision (b), any prisoner who the head physician of the institution where the prisoner is located determines, as provided in this section, is permanently medically incapacitated with a medical condition that renders him or her permanently unable to perform activities of basic daily living, and results in the prisoner requiring 24-hour care, and that incapacitation did not exist at the time of sentencing, shall be granted medical parole if the Board . . . determines that the conditions under which the prisoner would be released would not *reasonably* pose a threat to public safety." (Italics added.)

[4] McCarty's counsel represented that McCarty had declined to accept medical parole because he was concerned that "his quality of care [would] be degraded."

5

number of people victimized in his wake. [¶] So, his prior criminal record is a very strong record suggesting that the Court not grant compassionate release."

The court concluded: "Even if [McCarty] did not have medical parole available to him, I would be and I am exercising my discretion to deny compassionate release for all of the reasons that I've announced." McCarty filed a timely notice of appeal.

### III. DISCUSSION

On appeal, McCarty contends: "The court erred in concluding it had discretion not to release [him] if [the factual conditions of section 1170, subdivision (e)(2)] are proven. . . . When a prisoner meets the criteria . . . the only way a court can reasonably exercise its discretion is to recommend release. To find otherwise would defeat the purpose of the statute." He also maintains that the record does not support the superior court's findings with respect to the conditions of section 1170, subdivision (e)(2). Accordingly, McCarty asks us to vacate the superior court's denial and order his release. McCarty's statutory interpretation argument is a question of first impression.[5] However, we are not persuaded that this is the appropriate case in which to resolve the question.

First, we note that McCarty did not raise his statutory interpretation argument below. In fact, he specifically conceded that, even if the factual conditions of section 1170, subdivision (e)(2) were met, the trial court retained discretion to grant or deny compassionate release. "As a rule, parties are precluded from urging on appeal any points that were not raised before the trial court. [Citation.]" (*In re Marriage of Walker* (2006) 138 Cal.App.4th 1408, 1418.) However, we have discretion to address pure questions of law that present important issues of public policy. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; *City of Scotts Valley v. County of Santa Cruz* (2011)

---

[5] *Martinez, supra*, 183 Cal.App.4th 578, did not decide the same statutory interpretation question. In that case, the Board had denied a request for compassionate release. On review, the Third District Court of Appeal considered whether "may" in section 1170, subdivision (e)(1), reflected the Legislature's intent to give *the Board* discretion or a mandatory duty to recommend recall if the statutory criteria were met. (*Martinez,* at pp. 581, 588–589.)

201 Cal.App.4th 1, 28–29; *In re Marriage of Hinds* (1988) 205 Cal.App.3d 1398, 1403.) The correct interpretation of the compassionate release statute is certainly an important issue of law.

The bigger concern is mootness. McCarty died shortly after his opening brief on appeal was filed. The People argue that McCarty's objections to the challenged order have been mooted by his death. We agree. "An appellate court will not review questions which are moot and only of academic importance, nor will it determine abstract questions of law at the request of a party who shows no substantial rights can be affected by the decision either way. [Citation.] An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. [Citations.]" (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054–1055.) Even if we were to find error, we clearly could not grant the relief sought by McCarty.

We do have discretion to consider moot points if they are of continuing public importance and similar disputes are likely to arise, but evade review, in the future. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 879; *In re William M.* (1970) 3 Cal.3d 16, 23; *In re Christina A.* (2001) 91 Cal.App.4th 1153, 1158–1159; *People v. Pennington* (1991) 228 Cal.App.3d 959, 966, fn. 5.) Here, however, the statutory interpretation question is really beside the point. The superior court found: "I cannot be assured that [McCarty] does not pose a threat to public safety." McCarty argues, in his opening brief, that this finding was not supported by the record. But, that question is necessarily a fact-bound inquiry that is unique to McCarty. And, it is only if we agree with McCarty on that fact-bound inquiry that we would even need to reach the question of statutory interpretation. (See § 1170, subd. (e)(2).) Our Supreme Court has cautioned: "We should, of course, avoid advisory opinions on abstract propositions of law. [Citations.] But we should not avoid the resolution of important and well litigated controversies arising from situations which are 'capable of repetition, yet evading review.' [Citations.]" (*In re William M., supra,* 3 Cal.3d at p. 23, fn. 14.) This case falls in the former category. Accordingly, we decline to exercise our discretion to address McCarty's statutory interpretation argument.

### IV.   DISPOSITION

The appeal is dismissed as moot and is taken off the oral argument calendar.


_____

Bruiniers, J.


We concur:


_____

Simons, Acting P. J.


_____

Needham, J.