Filed 6/12/14  P. v. Jewell CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059455 |
| v. | (Super.Ct.No. VCR3309) |
| DENNIS LLOYD JEWELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John P. Vander Feer, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Defendant and appellant Dennis Lloyd Jewell (Jewell) is currently serving a sentence of 77 years to life in state prison for his 1987 convictions on five counts of second degree murder and one count of driving a stolen vehicle. Jewell was diagnosed with terminal lung cancer and is undergoing palliative chemotherapy. The Board of Parole Hearings (Board) recommended to the superior court that Jewell's sentence be recalled and that he be granted a compassionate release under Penal Code[1] section 1170, subdivision (e), because it concluded Jewell had no more than six months to live and he posed no threat to the public. After a contested hearing, the superior court ruled there was insufficient evidence for it to conclude Jewell was eligible for release because no physician opined that Jewell would actually die within six months. The court also ruled that, because Jewell's postrelease plan changed after the Board recommended his release, it could not determine that Jewell posed no risk to public safety. The trial court denied the Board's recommendation without prejudice, and defendant timely appealed.

On appeal, Jewell contends the trial court abused its discretion by denying the Board's recommendation. The People argue the order denying the Board's recommendation is not appealable by Jewell, and request that we dismiss the appeal for lack of jurisdiction.[2] Assuming we reach the merits of the appeal, the People contend the

_____

[1] All further undesignated statutory references are to the Penal Code.

[2] By written order dated December 30, 2013, we reserved ruling on the People's motion to dismiss. As discussed *post*, the motion is denied.

2

trial court properly denied the Board's recommendation. Jewell opposes the motion to dismiss, arguing he has standing to appeal as an aggrieved party.

We conclude Jewell may appeal the order denying the Board's recommendation of a sentence recall and compassionate release, and deny the People's motion to dismiss. On the merits, we conclude the trial court erred by applying too rigid a standard for determining whether Jewell's terminal illness would result in his death within six months. However, we find the trial court did not abuse its discretion by finding there was insufficient evidence that Jewell's release would not pose a threat to public safety. Therefore, we affirm the postjudgment order.

## FACTS AND PROCEDURAL BACKGROUND

In an information filed in 1985, the People alleged that Jewell killed a mother and her four children while driving a stolen vehicle under the influence of alcohol. In 1987, a jury convicted Jewell of five counts of second degree murder (Pen. Code, § 187) and one count of driving a stolen vehicle (Veh. Code, § 10851). The court sentenced Jewell to state prison for a total of 77 years to life.

A.     *Background to the Board's Recommendation.*

On February 15, 2013, Dr. Von Lintig, a physician employed by the Department of Corrections and Rehabilitation (Department), prepared a report regarding a possible sentence recall for Jewell. Dr. Von Lintig reported that Jewell was diagnosed with terminal, metastatic hepatocellular cancer with metastatic disease in his right lung, that Jewell underwent an upper pneumectomy, and that he was receiving palliative chemotherapy. The physician also reported that Jewell was suffering from cancer-related

3

chronic pain and chronic productive cough, among other ailments, and that he was awaiting a colonoscopy to determine whether his cancer had spread to his colon. Jewell's life expectancy, which Dr. Von Lintig confirmed with Dr. Wilkinson, Jewell's oncologist, was "likely less than 6 months." Dr. Von Lintig also reported that Dr. Wilkinson highly recommended Jewell for compassionate release "given his very poor prognosis and limited life expectancy." Finally, Dr. Von Lintig reported that, if released, Jewell would have the support of his younger brother and a friend, and that Jewell would likely receive Veteran's Administration (VA) benefits and could apply for subsidized housing and other public assistance.

The following month, the warden at Centinela State Prison approved a diagnostic study regarding Jewell's eligibility for a sentence recall under section 1170, subdivision (e). The study included information from Dr. Von Lintig's report, including Jewell's diagnosis and treatment for lung cancer and his other maladies. The study reported that, "At this time, Jewell's life expectancy cannot clearly be estimated, but it is possible that he could live 6 months or less." With respect to Jewell's behavior in prison, the study reported that Jewell received rule infractions for misuse of property and for refusing to perform work, but that on the whole Jewell was compliant. The undersecretary for the Department's operations forwarded the study to the chief of investigations for consideration of a sentence recall for Jewell, and reported that "Physicians . . . have surmised his life expectancy is possibly less than six months."

In its April, 8, 2013 recommendation to the Board that Jewell be considered for a sentence recall, the investigations division reported that the results of Jewell's

4

colonoscopy were negative for cancer and that Jewell's condition remained stable. The recommendation also reported that Jewell was experiencing pain from a tumor in his liver, and that, although his oncologist was considering removing the tumor, the procedure was very dangerous. Finally, the recommendation included a proposed release plan for Jewell. Jewell's sister and nephew agreed to care for Jewell in their Arizona home, and they would rent a car to drive Jewell there. Jewell's sister told the Department that their younger brother also lives nearby and would assist in caring for Jewell. Finally, Jewell's sister contacted a local hospice provider for Jewell, reported that she would assist Jewell to apply for Social Security disability benefits, and stated she lives near a VA hospital.

At a hearing conducted on April 16, 2013, the Board approved the request for consideration of a sentence recall for Jewell. The Board found that Jewell was "terminally ill with an incurable condition caused by an illness or disease that would produce death within six months and the conditions under which [he] would be released or receive treatment do not pose a threat to public safety." The same day, the Board forwarded its recommendation to the superior court.

B.      *Proceedings in the Superior Court.*

In its opposition to the Board's recommendation, the People argued Jewell continued to pose a threat to public safety and that the Board's contrary conclusion was not supported by any evidence. According to the People, the record did not demonstrate that Jewell would remain sober if he were released. The opposition was supported by correspondence from Jewell to the district attorney and to his former attorney which,

5

according to the People, demonstrated that Jewell continued to lack insight into his commitment crimes. Finally, the People attached a letter from the surviving husband and father of the victims of Jewell's commitment crimes, opposing Jewell's release.

Two days before the hearing on the Board's recommendation, an investigator for the Board notified the superior court that Jewell's postrelease plan had changed because his sister no longer lived in the home where she planned to care for Jewell. According to the investigator, Jewell indicated his desire to live with a longtime friend in Minnesota. The investigator did not provide any additional information about a new postrelease plan, but provided the court with the friend's telephone number.

In a reply to the People's opposition, Jewell's attorney argued that Jewell was not a threat to the public and attached correspondence attesting to Jewell's long-term sobriety. Counsel also provided the court with a report of a consultation Jewell had with Dr. Wilkinson on July 10, 2013, which reiterated Jewell's terminal diagnosis and negative prognosis. Dr. Wilkinson reported that Jewell's health was "slowly deteriorating," and he estimated Jewell's "overall survival to be 4 months or less based on national statistics with regard to metastatic hepatocellular carcinoma to lung with progressive disease and deterioration," with palliative chemotherapy treatment.

Counsel also informed the court of Jewell's new postrelease plan. If released, Jewell would reside with a friend in Minnesota who expressed her willingness and ability to care for Jewell, and Jewell would be eligible to apply for VA health care benefits for his ongoing treatment. Attached to the reply was a letter from Jewell's friend in Minnesota, in which she informed the court that she and Jewell had corresponded for

6

some nine years, and that in their correspondence Jewell expressed deep remorse and regret about the lives he took because of his addiction, and he expressed his dedication to continued sobriety.

At that hearing, the People argued the trial court should deny the Board's recommendation because Jewell's postrelease plan changed significantly and, in light of the change, the Board's finding that Jewell's release would pose no risk to public safety was now called into question. The People also argued the trial court had discretion to take into consideration Jewell's commitment offenses, and that the nature of his crimes, his lack of remorse, and the opposition of the surviving family member, all supported denial of compassionate release.

Jewell's attorney informed the court that Jewell's postrelease plan changed because his sister was now homeless. Counsel indicated that, as soon as he learned about the sister's homelessness, he immediately informed the Board of this change of situation and of Jewell's wish to live with his friend in Minnesota. According to counsel, Jewell's friend works at a treatment center for chemically dependent persons and is therefore well-suited to care for Jewell in his remaining few months. When counsel informed the court that Jewell's physician determined that Jewell had four months or less to live, the court interjected, "According to national statistics." Counsel responded that the prognosis came from "the State's doctor [who had] evaluated him, based on that doctor's knowledge." The court again interjected, "Based on national statistics."

With respect to the People's contention that the court should consider Jewell's commitment offenses, Jewell's attorney argued the commitment offenses should not be a

7

factor in determining eligibility for compassionate release because it would frustrate the purpose of the statute.  Moreover, counsel argued the Department and the Board properly considered whether Jewell would pose a risk to public safety, and concluded he would not.  Finally, counsel argued that Jewell's new postrelease plan was an improvement on his original plan because now he would be cared for by a person who works with chemically dependent individuals, and that the correspondence submitted with the reply amply demonstrated Jewell's commitment to sobriety.

Based on Dr. Wilkinson's report of Jewell's diagnosis with terminal lung cancer, the court found that Jewell was terminally ill with an incurable condition, for purposes of section 1170, subdivision (e)(2)(A).[3]  With respect to Jewell's prognosis, the court noted, "The question is, is [it] a fact that [Jewell's cancer] would produce death within six months, which is the same as will or is."  Referring to Dr. Wilkinson's more recent report of July 2013, the court said the prognosis of death within four months or less was "an anticipation based on national statistics.  That opinion with his condition the average age—average survival rate is four months."  The court appeared to discount the value of survivability statistics, by noting, "We have actuary tables that I'm supposed to die at 78 being a white male adult.  That could happen.  I could die sooner.  I could die later."

---

[3] The trial court assumed Dr. Wilkinson was either employed or retained by the Department.  The record is not clear on that question, but because the People do not dispute that Dr. Wilkinson's opinions are relevant to the trial court's findings, we too assume Dr. Wilkinson is "a physician employed by the department."  (§ 1170, subd. (e)(2)(A).)

However, the court then stated, "So that's a clear fact to the Court that he has less than six months."

Notwithstanding its apparent conclusion that Jewell had six months or less to live, the court noted that the study presented to the Board in March 2013 reported that Jewell had "a possible life expectancy of six months or less to live. . . . But I think that's not the standard." According to the court, if the Legislature intended that a prognosis of possible death within six months would suffice, "they would have used [the] words possible or medical certainty. But the [required finding is] that [the terminal illness] would produce death—that [it] would produce death within six months." Although the court recognized that "doctors are not always going to be sure," it noted that the March 2013 study indicated "possible" death within six months, and the July 2013 report indicated "anticipated" death within four months "based on national statistics." Therefore, the court concluded there was not "sufficient data" to make a factual finding "that it's a fact that he would die within six months . . . ."

In the alternative, the court ruled it could not make a finding of fact under section 1170, subdivision (e)(2)(B), that Jewell's release would pose no risk to public safety. The court expressed its view that a prisoner who killed his victim while driving under the influence of alcohol poses a greater danger than a prisoner who killed after having a dispute with the victim, and that the Board did not address that concern. Moreover, the court noted the Board did know of the changed conditions under which Jewell would be released and treated when it made its recommendation. "He's just going to some lady's place in Minnesota, assuming he gets there. We don't know if she has

9

alcohol in the home.  You know, if he would have the ability to consume alcohol, he would have the ability to get behind the wheel of a motor vehicle."

After reviewing the record of Jewell's commitment offence, his rule infractions while in prison, and his postconviction correspondence, the court concluded it could not make a finding that Jewell would pose no threat to public safety.  Rather than refer the matter back to the Board for further investigation of Jewell's new postrelease plan, as requested by Jewell's attorney, the court denied the Board's request without prejudice.  Jewell timely appealed.

DISCUSSION

I.

JEWELL MAY APPEAL FROM THE POSTJUDGMENT ORDER DENYING THE BOARD'S RECOMMENDATION OF A SENTENCE RECALL AND COMPASSIONATE RELEASE

In its motion to dismiss Jewell's appeal, the People argue that, because Jewell had no right to apply to the superior court for a compassionate release, the court's denial is not a postjudgment order affecting Jewell's "substantial rights" and is therefore not appealable under section 1237, subdivision (b).  In his opposition to the motion, Jewell contends he had a definite interest in the outcome of the proceeding below and, therefore, he has standing to appeal.  As the parties acknowledge, the question of whether an order denying a sentence recall and compassionate release under section 1170, subdivision (e), is an appealable order is pending before the California Supreme Court (*People v. Loper*,

10

review granted Sept. 11, 2013, S211840), and no other court has addressed that question in a published decision.

"""It is settled that the right of appeal is statutory and that a judgment or order is not appealable unless expressly made so by statute."' [Citations.]" (*People v. Mena* (2012) 54 Cal.4th 146, 152.) Relevant here, a defendant may appeal "[f]rom any order made after judgment, affecting the substantial rights of the party." (§ 1237, subd. (b).) As one court noted, "[i]f interpreted broadly, [section 1237, subdivision (b)] would apply to any postjudgment attack upon the conviction or sentence." (*People v. Gallardo* (2000) 77 Cal.App.4th 971, 980.) "However, decisional authority has limited the scope of [section 1237, subdivision (b)], defining appealability more narrowly." (*Ibid.*)

As the People contend, and Jewell concedes, a prisoner has no right to request in the superior court that the court consider him for a compassionate release. Section 1170, subdivision (e), governs the sentence recall and compassionate release of eligible prisoners who were not sentenced to death or to life without the possibility of parole. (§ 1170, subd. (e)(2); see *Martinez v. Board of Parole Hearings* (2010) 183 Cal.App.4th 578, 581 (*Martinez*).) If the secretary of the Department, the Board, or both, determine that a prisoner meets the criteria for compassionate release, the secretary or the Board may recommend that the superior court recall the prisoner's sentence and grant a compassionate release. (§ 1170, subd. (e)(1), (2)(A)-(C).) The prisoner, or his family or designee, may request that the Department consider him for a compassionate release and make a recommendation to the Board. (§ 1170, subd. (e)(6).) But it is ultimately the Board which may make a recommendation to the superior court, not the prisoner. (*Ibid.*)

11

The People rely on *People v. Pritchett* (1993) 20 Cal.App.4th 190 (*Pritchett*) for the proposition that a prisoner's substantial rights are not affected by the denial of a sentence recall and compassionate release under section 1170, subdivision (e). In that case, the trial court refused a request from defense counsel to recall the sentence pursuant to section 1170, subdivision (d), and the defendant appealed from that postjudgment order. (*Pritchett*, at pp. 192-193.) The People argued the postjudgment order did not affect the defendant's substantial rights and, therefore, was not appealable under section 1237, subdivision (b). (*Pritchett*, at p. 193.) The Court of Appeal agreed. "[The] order is *not* an 'order made after judgment, affecting the substantial rights of the party.' Section 1170 subdivision (d) does not confer standing on a defendant to initiate a motion to recall a sentence. Instead, that section permits a court to recall a sentence 'on its *own* motion.'[4] [Citations.] Consequently, the courts have uniformly held that an order *denying* a defendant's request to resentence pursuant to section 1170 subdivision (d) is not appealable as an order affecting the substantial rights of the party. This is because the defendant has no right to request such an order in the first instance; consequently, his 'substantial rights' cannot be affected by an order denying that which he had no right to request.' [Citations.]" (*Id*. at pp. 193-194.)

*Pritchett* is the most recent decision in an unbroken line of cases holding that a defendant may not move for a sentence recall under section 1170, subdivision (d) (and its

---

**4** Section 1170, subdivision (d)(1), now provides that the trial court may recall the sentence on the recommendation of the secretary or the Board.

former iteration under former § 1168) and, therefore, may not appeal from the denial of his own improper request for a sentence recall. (*People v. Chlad* (1992) 6 Cal.App.4th 1719, 1723, 1725-1726; *People v. Gainer* (1982) 133 Cal.App.3d 636, 639-642; *People v. Druschel* (1982) 132 Cal.App.3d 667, 668-669; *People v. Niren* (1978) 76 Cal.App.3d 850, 851 [Fourth Dist., Div. Two] (*Niren*).) Those cases are distinguishable, however, because Jewell did not improperly request that the trial court recall his sentence and grant him a compassionate release. Instead, the Board properly recommended a sentence recall and compassionate release for Jewell.

We find the decision in *People v. Herrera* (1982) 127 Cal.App.3d 590 (*Herrera*) analogous to the situation presented here. In *Herrera*, the trial court sentenced the defendant to nine years and four months in state prison for his convictions for four counts of robbery and one count of attempted robbery. (*Id*. at p. 594, disapproved on another ground in *People v. Martin* (1986) 42 Cal.3d 437, 451, fn. 13 (*Martin*).) The former Board of Prison Terms, after reviewing the defendant's sentence and finding that it was disparate when compared to similarly situated prisoners, requested that the trial court recall the sentence pursuant to former section 1170, subdivision (f).[5] (*Herrera*, at p. 594.) Former section 1170, subdivision (f), vested the authority to request a sentence recall on the grounds of disparateness solely in the former Board of Prison Terms, and

_____

[5] The Legislature repealed former section 1170, subdivision (f), in 1992, and the trial court's jurisdiction to recall a sentence based on disparateness is now found in section 1170, subdivision (d)(1). (Stats. 1992, ch. 695, § 10, pp. 2975-2977; see *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1770 [Fourth Dist., Div. Two].)

13

not in the defendant himself. (*Herrera*, at p. 594, fn. 3.) The trial court denied the request, and the defendant appealed. (*Id*. at pp. 593-594.) On appeal, the People relied on *Niren*, *supra*, 76 Cal.App.3d 850, for the proposition that the defendant had no right to move for a sentence recall and, therefore, the order denying the request from the former Board of Prison Terms did not affect the defendant's substantial rights such that he could appeal from the postjudgment order. (*Herrera*, at p. 595.)

The Court of Appeal found that *Niren*, *supra*, 76 Cal.App.3d 850, was not on point. "The case at bench differs from *Niren* in one crucial respect. In *Niren* defendant improperly initiated a motion to recall his sentence at the trial court level; he then appealed from the denial of his own improperly brought motion. [¶] In the instant action, there is no question that the motion was properly initiated by the Board. The question here is: Assuming that the motion for recall was properly initiated by the Board, does the prisoner have the right to appeal from the denial of that motion *even though he could not have initiated the motion himself*?" (*Herrera*, *supra*, 127 Cal.App.3d at p. 596.) The court answered the question in the affirmative. "Application of [section 1237, former subdivision 2 (now subdivision (b))] is not confined to orders resulting from motions initiated by the defendant; rather, by its own terms, the statute applies to 'any' order affecting the substantial rights of the party." (*Ibid*.) Because the order affected the defendant's right to be sentenced consistently with other similarly situated prisoners, the court concluded the defendant could appeal from the order denying the former Board of Prison Terms' request for a sentence recall. (*Id*. at pp. 596-597.) Although the California Supreme Court subsequently disapproved of *Herrera*'s analysis of whether a sentence is

14

disparate (*Martin*, *supra*, 42 Cal.3d at pp. 446, 451, fn. 13), it cited *Herrera* with approval for the proposition that "[t]he trial court's decision to deny a motion to recall under [former section 1170, subdivision (f)] is an appealable order" (*Martin*, at p. 450, citing *Herrera*, at pp. 595-597).

The legislative purposes behind section 1170, subdivision (e), are to show compassion for dying or permanently medically incapacitated prisoners, and to save the state money by reducing the number of prisoners who must receive expensive end-of-life treatment. (*Martinez*, *supra*, 183 Cal.App.4th at pp. 590-592.) Although it is debatable whether a prisoner has a right to compassion, *Herrera* does call into question the application of *Pritchett* and its forbears to the situation presented here, as requested by the People. Those cases were firmly rooted in the notion that a defendant has no right to request a sentence recall and, therefore, he cannot appeal when the trial court correctly denies his improper request. (*Pritchett*, *supra*, 20 Cal.App.4th at pp. 193-194.) When the trial court denies a properly submitted recommendation from the Board that a prisoner's sentence be recalled, that order is appealable under section 1237, subdivision (b). (See *Martin*, *supra*, 42 Cal.3d at p. 450.) Therefore, we deny the People's motion to dismiss the appeal.

15

II.

THE TRIAL COURT ERRED BY APPLYING TOO RIGID A STANDARD FOR

DETERMINING WHETHER JEWELL'S TERMINAL CANCER WILL RESULT IN

HIS DEATH WITHIN SIX MONTHS

The Board may recommend to the superior court that a prisoner's sentence be recalled and that the prisoner be granted a compassionate release if it determines: (1) "[t]he prisoner is terminally ill with an incurable condition caused by an illness or disease that would produce death within six months, as determined by a physician employed by the department" (§ 1170, subd. (e)(2)(A)), and (2) "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety" (§ 1170, subd. (e)(2)(B)).[6] The Board must make findings regarding a prisoner's eligibility for a sentence recall and compassionate release, and its recommendation to the superior court must be supported by at least one medical evaluation of the prisoner, a postrelease plan, and the Board's eligibility findings. (§ 1170, subd. (e)(2), (7).)

The superior court must conduct a hearing within 10 days of receiving the Board's recommendation, and the hearing should, if possible, be conducted by the sentencing judge. (§ 1170, subd. (e)(3), (8).) "The court shall have the discretion to resentence or recall if the court finds that the facts described in subparagraphs (A) and (B) . . . exist,"

---

[6] The Board may also recommend compassionate release if it determines a prisoner is "permanently medically incapacitated" and would not pose a threat to public safety if released. (§ 1170, subd. (e)(1), (2)(B)-(C).) Because the Board did not find that Jewell is permanently incapacitated, the superior court did not consider whether he was entitled to compassionate release under that provision and neither do we.

i.e., if it finds that the prisoner is suffering from a terminal illness that would result in death within six months, and that the prisoner's release will not pose a risk to public safety. (§ 1170, subd. (e)(2).) If the court grants the Board's recommended sentence recall, the prisoner must be released within 48 hours of the receipt of the court's order, unless the prisoner consents to a longer period. (§ 1170, subd. (e)(9).)

The Board's and the trial court's findings of fact under section 1170, subdivision (e), are subject to the "some evidence" standard from normal parole proceedings. (See *Martinez*, *supra*, 183 Cal.App.4th at pp. 593-594.) When the trial court denies the Board's recommendation based on the court's interpretation of section 1170, subdivision (e), that decision is a question of law that we review de novo. (*Martinez*, at pp. 587-588.)

Section 1170, subdivision (e), does not define with what degree of certainty a Department physician, the Board, and the superior court must determine that an inmate's terminal disease "would produce death within six months."[7] (§ 1170, subd. (e)(2)(A).) We have found no published decisions addressing this question, and the parties have cited none to us. As the trial court noted, "would" is the past tense of "will." But neither tense implies the certainty the court imputed to the statute and, at most, they express the "probability" (Webster's 3d New Internat. Dict. (1993) p. 2617, col. 1), "contingency," or

---

[7] Nor do the Board's regulations, which govern recommendations for compassionate release. (Cal. Code Regs., tit. 15, §§ 3076, subd. (b)(1), 3076.4, subd. (a).)

17

"possibility" of a future event[8] (*id.* at p. 2638, col. 1). We do not read section 1170, subdivision (e), to require certainty, and instead we give "would" its ordinary meaning. (*People v. Maultsby* (2012) 53 Cal.4th 296, 299 ["In interpreting a statute to ascertain the Legislature's intent, we give the words their usual and ordinary meaning"].)

Despite impressive scientific advances in the modern age, the practice of medicine is still not an exact science. (See, e.g., Bus. & Prof. Code, § 2033 [for purposes of the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.), "'Professional' relates to *the art and science of medicine and surgery* and to such other arts and sciences as may be included within the field of medicine and surgery." (Italics added.)].) "'Clinical judgment, combining both the "art" and "science" of medicine, constitutes the essence of medical practice.'" (*Milpitas Unified School Dist. v. Workers' Comp. Appeals Bd.* (2010) 187 Cal.App.4th 808, 823, quoting the American Medical Association's Guides to the Evaluation of Permanent Impairment (5th ed.) § 1.5, p. 11.) When determining a specific patient's chances of survival from cancer, or when determining how much longer a terminally ill cancer patient has to live, a physician must base his or her clinical judgment on their experience and training relating to that form of cancer, the patient's medical history, and on available statistics and probabilities produced through peer-reviewed research studies. (See, e.g., Moons et al., *Prognosis and prognostic research: what, why,*

---

[8] The trial court thought that "would" in section 1170, subdivision (e)(2)(A), was also synonymous with "is." We disagree. In contrast to "will" and its past tense, which are contingent, "is" refers to an empirical fact, meaning "actually the case." (Webster's 3d New Internat. Dict., *supra*, p. 1197, col. 2.)

*and how?* (May 30, 2009) British Medical Journal, p. 1317.)[9]  For better or worse, neither of these factors which inform a physician's clinical judgment is likely to produce absolute certainty.

Therefore, we conclude reasonableness is the appropriate standard for evaluating a Department physician's prognosis.  In other words, when reviewing a recommendation by the Board for compassionate release under section 1170, subdivision (e)(2)(A), the superior court must determine whether the Board's determination of death within six months is supported by the reasonable clinical judgment of a Department physician, and not whether the evidence supports the conclusion that the prisoner will in fact die within six months.[10]  The trial court erred by interpreting the statute to require something more.

The People argue that a Department physician's opinion of possible death within six months is insufficient, and that the physician must be more certain of his or her prognosis.  In support of that argument, the People direct our attention to section 1170, subdivision (e)(4), which provides in part:  "Any physician employed by the department who determines that a prisoner has six months or less to live shall notify the chief

---

[9]  Available at <http://www.bmj.com/content/338/bmj.b375> (as of June 12, 2014).

[10]  We find further support for our conclusion in recently enacted legislation on a similar topic.  The county jail equivalent to section 1170, subdivision (e), provides that a sheriff may release an inmate if, among other things, "upon diagnosis by the examining physician, [the inmate] is deemed to have a life expectancy of six months or less."  (Gov. Code, § 26605.6, subd. (a), amended by Stats. 2013, ch. 23, § 3, eff. June 27, 2013.)  If the Legislature intended that jail inmates may only qualify for a compassionate release if a physician is certain they will die within six months, it would have used stronger language than that the inmate "is deemed" to have six months or less to live.

19

medical officer of the prognosis.  If the chief medical officer concurs with the prognosis, he or she shall notify the warden."  Like section 1170, subdivision (e)(2)(A), subdivision (e)(4) does not answer the question of how certain the Department physician must be of his or her prognosis of death within six months.  A physician's "prognosis" is merely a "forecast" (The Sloane-Dorland Ann. Medical-Legal Dict. (1987) p. 581, col. 1), or "prediction" of a patient's chances of survival from a disease (Webster's II New College Dict. (2001) p. 883, col. 2).  It is the "act or art of foretelling the course of a disease" (Webster's 3d New Internat. Dict., *supra*, p. 1812, col. 3), "judged by the nature and severity of the ailment, the condition of the patient, etc." (3 Schmidt's, Attorneys' Dict. of Medicine (1992) p. P-332, col. 2).  Therefore, the People's citation to section 1170, subdivision (e)(4), and their emphasis on the word "prognosis," actually supports our conclusion that a determination of death within six months must be judged according to reasonable clinical judgment, and not by a more rigid standard of certainty.

In his report, which formed the basis of the Board's recommendation, Dr. Von Lintig opined that Jewell's life expectancy was "likely less than 6 months," and he reported that Dr. Wilkinson concurred.  In his own report submitted with Jewell's reply, Dr. Wilkinson indicated that Jewell was slowly deteriorating, and Dr. Wilkinson estimated that, based on relevant statistics, Jewell had four months or less to live.  The language on which the trial court and the People focus—that "Jewell's life expectancy cannot clearly be estimated, but it is *possible* that he could live 6 months or less" (italics added)—came from the diagnostic study approved by the warden, not from Dr. Von Lintig or Dr. Wilkinson.  It is not clear whether medical staff assisted in preparing the

20

study, and it appears the quoted language was merely a gloss placed on Dr. Von Lintig's assertion that Jewell "likely" had six months or less to live. Likewise, in his cover letter to the chief of investigations, the Department's undersecretary reported that Jewell's physicians "surmised his life expectancy is possibly less than six months." Again, it would appear this was simply a gloss placed on Dr. Von Lintig's report.

The actual medical reports presented to the court amply demonstrate that two Department physicians rendered reasonable medical judgments that Jewell had six months or less to live. That Jewell's physicians and prison officials reported he "likely" or "possibly" had six months to live does not undermine the Board's factual finding that Jewell's terminal illness "would produce death within six months." As the court itself recognized, "doctors are not always going to be sure," and it is perhaps to be expected that a physician will use careful and cautious language when giving a prognosis of life expectancy.[11] Because the trial court applied too rigid a standard for reviewing the Board's determination that Jewell had less than six months to live, and the record before the court demonstrated that the Board's determination was supported by the reasonable medical judgment of two Department physicians, we conclude the court erred by ruling it lacked data to make a finding under section 1170, subdivision (e)(2)(A).

---

[11] Conversely, the reported decisions demonstrate that Department physicians may be trusted to accurately report when a prisoner is *not* likely to die within six months. (See *In re Lee* (2006) 143 Cal.App.4th 1400, 1407; *In re Smith* (2003) 109 Cal.App.4th 489, 494-495.)

21

## III.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY RULING IT DID NOT HAVE SUFFICIENT EVIDENCE TO CONCLUDE THAT JEWELL'S RELEASE WOULD NOT POSE A THREAT TO PUBLIC SAFETY

As noted, the Board may only recommend a sentence recall and compassionate release if it determines that "[t]he conditions under which the prisoner would be released or receive treatment do not pose a threat to public safety." (§ 1170, subd. (e)(2)(B).) The Board's finding that a prisoner will not pose a threat to public safety is reviewed for "some evidence." (See *Martinez*, *supra*, 183 Cal.App.4th at pp. 593-594.) The trial court's ruling that the Board's finding was not supported by some evidence is subject to the same deferential review. (*Ibid.*)

The trial court correctly ruled that the Board's recommendation was not supported by a current postrelease plan, and it correctly ruled that, on the record, it could not conclude that the conditions under which Jewell might be released and treated would pose no risk to public safety. When the investigations division recommended that the Board consider a sentence recall for Jewell, the postrelease plan called for Jewell to live with his sister and nephew in Arizona. The plan envisioned that Jewell would live out his final months being cared for by his siblings and close family, who would assist Jewell in obtaining services from the VA and other public assistance. That was the plan that the Board approved and forwarded to the superior court pursuant to section 1170, subdivision (e)(7).

There is no indication in the record that the Board approved the new plan for Jewell to live with his friend in Minnesota. At most, the record indicates the chief of investigations for the Board was aware of the changed plan, and that he informed the court about it in writing. Moreover, the letter from Jewell's friend submitted to the trial court was not calculated to inspire confidence in the new postrelease plan. In the letter, Jewell's friend indicated that she and Jewell began corresponding some nine years earlier when Jewell wrote to a nonprofit organization for which she had volunteered. The letter did not indicate whether Jewell's friend ever met Jewell in person. And unlike the information about the original postrelease plan, the letter did not indicate that Jewell's friend had already started the process of obtaining treatment assistance for Jewell, and it did not say how Jewell would get to Minnesota.

Because the circumstances under which Jewell would be released and treated changed after the Board recommended his release, and the record does not indicate the Board approved the new postrelease plan or considered it when it made its determination that Jewell's release would pose no risk to public safety, we conclude the court did not abuse its discretion by denying the recommended sentence recall.

During oral argument before this court, Jewell's appointed counsel informed us that Jewell's friend in Minnesota prepared and signed a new proposed postrelease plan, but that this new plan has not yet been submitted to the Board. Because that new proposed plan was not before the Board when it made its recommendation to the trial court, and it was not presented to the trial court when it denied the Board's recommendation, we will not consider that information in this appeal. Nonetheless, we

23

note that nothing in section 1170, subdivision (e), would prevent Jewell or his attorney from presenting his new proposed postrelease plan to the Board for its consideration, as he did when his original postrelease plan fell through.  If the Board approves of the new postrelease plan and again recommends Jewell's recall and release, at that time the trial court shall consider whether the new conditions of Jewell's release and treatment pose a risk to public safety.

## IV.

## DISPOSITION

The postjudgment order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:


HOLLENHORST
Acting P. J.


KING
J.

24